IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * | * CIVIL ACTION |
| ANTONIO L. GIORDANO | * 08-48S |
| | * |
| VS. | * MARCH 26, 2008 |
| | * |
| MT. ST. FRANCIS, | * |
| ASSOCIATES, LLP | * PROVIDENCE, RI |
| * * * * * * * * * * * * | * |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(ADMINISTRATIVE CLAIM HEARING)

APPEARANCES:

FOR MR. GIORDANO: JOSEPH AVANZATO, ESQ.
Adler, Pollock & Sheehan
One Citizens Plaza
8th Floor
Providence, RI 02903

FOR THE RECEIVER: JOSEPH P. FERRUCCI, ESQ.
Ferrucci Russo, P.C.
55 Pine Street
4th Floor
Providence, RI 02903

FOR USA: JAMES E. BROWN, ESQ.
U.S. Department of Justice
P.O. Box 55
Ben Franklin Station
Washington, D.C. 20044

FOR HUD: LY NGUYEN, ATTY.
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

APPEARANCES: (Continued)

| | |
|---|---|
| FOR SUBURBAN MORTGAGE: | JEFFREY S. BRENNER, ESQ.<br>Nixon Peabody, LLP<br>One Citizens Plaza<br>Providence, RI 02903 |
| FOR AMERICAN SENIOR LIVING: | JONATHAN SAVAGE, ESQ.<br>and DOUGLAS GIRON, ESQ.<br>Schechtman Halperin<br>Savage, LLP<br>1080 Main Street<br>Pawtucket, RI 02860 |
| FOR MIDLAND LOAN SERVICES: | STEPHEN M. PRIGNANO, ESQ.<br>Edwards Angell Palmer &<br>Dodge, LLP<br>2800 Financial Plaza<br>Providence, RI 02903 |
| Court Reporter: | Anne M. Clayton, RPR<br>One Exchange Terrace<br>Providence, RI 02903 |

Proceeding reported and produced by computer-aided stenography

THE COURT: Good morning. This is the matter of Giordano versus Mt. St. Francis and the United States versus Mt. St. Francis. We're here on various motions. Motion to affirm the claims.

Let's have the parties identify themselves for the record beginning with the plaintiff.

MR. AVANZATO: Good morning, your Honor. Joseph Avanzato on behalf of Antonio Giordano.

THE COURT: Okay. Who else is here?

MR. FERRUCCI: Good morning, your Honor. Joseph Ferrucci.

THE COURT: I was looking around for you. I didn't see you over here.

MR. BRENNER: Jeffrey Brenner representing Suburban Mortgage Associates, Incorporated.

MR. BROWN: Good morning, your Honor. James Brown for the creditor, the United States of America.

MS. DONOVAN: Good morning, your Honor. Dulce Donovan also for the United States. Mr. Brown will be arguing our position today.

THE COURT: Okay. I think we should get everyone else's appearances just so the record is clear who all is here.

MR. GIRON: Douglas Giron and Jonathan Savage for manager of the receiver, American Senior Living

Communities.

MR. PRIGNANO: Your Honor, Stephen Prignano. I represent Midland Loan Services. I entered my appearance this morning. Midland is an interested party for the first and second mortgage of the bank.

MS. NGUYEN: Ly Nguyen for the United States for the Department of Housing and Urban Development.

MR. NOLAN: Steve Nolan on behalf of White Mountain Advisors. We're the note holders on the mortgage.

THE COURT: Very good. Just let me get on the record the fact that Mr. Prignano and I used to be partners in the same firm for many years. And my standing practice was to recuse myself in matters that involved Edwards & Angell for the first three years I was on the bench. Subsequent to that, I've just made it a practice to bring it to parties' attention if an Edwards & Angell lawyer who I was partners with is part of a case, so I'm bringing it to your attention. If anyone has any objection or believes there's any reason that I should consider not hearing this matter, I'd like you to bring it to my attention now. Anybody? Okay.

All right. Well, let's move forward then and I'll hear from the moving party.

MR. AVANZATO: May it please the Court, Joseph Avanzato on behalf of Antonio Giordano. Your Honor, I'm here to address the motion for an administrative claim.

Your Honor, the papers are clear so I'm not going to belabor everything in them. I'm going to make a few brief comments with the Court's permission and then save some time for rebuttal, if I may.

THE COURT: Okay. That's good.

MR. AVANZATO: Your Honor, in this case, American Senior Living stands to purchase the asset of this receivership estate for more than ten million dollars in value. There is no other even remotely comparable offer. What American Senior Living requires, however, is the release from Mr. Giordano. And it is an undisputed fact that American Senior Living will not acquire these assets without that release.

The requirement of this release is addressed in a post-petition agreement pursuant to which American Senior Living would pay $900,000 into the receivership estate and Mr. Giordano would make his administrative claim. And if that claim is approved, Mr. Giordano would provide the required release.

It is Mr. Giordano's position that his release

helps to preserve the assets of this receivership estate by enabling the sale to American Senior Living for what we believe is the maximum value that could be attained.

The concept, your Honor, of preserving the assets of the estate encompasses more than merely maintaining premises or upkeeping equipment. It includes, and must include, the effort to sell the assets of the receivership estate for the highest amount reasonably possible. And that is what the release of Mr. Giordano in this case would do, it would permit the sale to American Senior Living for more than ten million dollars in value.

And for that reason, it is our position that the release benefits the receivership estate and would constitute one of the actual necessary costs of preserving this estate.

THE COURT: Can you just tell me in simple, straightforward terms how this fits into the statutory framework that we're dealing with here?

MR. AVANZATO: Yes, your Honor. The statutory framework of 11 U.S.C. Section 513(b)(1)(A) I believe is what your Honor is referencing, it has to constitute an actual necessary cost and expense of preserving the estate. Preserving the estate, your Honor, we argue,

encompasses the necessary expenses to sell the assets for their maximum value.

In this case, the offer of American Senior Living would result in the maximum value for this receivership, but one of the prerequisites is the release from Mr. Giordano.

So the cost of obtaining that release, which is indispensable for the sale, would constitute one of the necessary costs of preserving the estate.

If that cost is not incurred, if the release is not obtained, then the resultant loss to the receivership would be millions of dollars, and that is why we argue that the release is both necessary and beneficial to the estate and necessary to preserve the assets.

THE COURT: When we talk about preserving the assets of the estate or -- what is the estate? Is the estate the sum total of all of the various assets that are owned, or is it an ongoing business that has value more than its parts, like a business that manufactures widgets is more than just the machine that makes widgets. It has other values, right?

MR. AVANZATO: Yes, your Honor.

THE COURT: So what is it?

MR. AVANZATO: This estate would include the

going-concern value of the nursing home, your Honor. I'm not sure I follow the Court's question, but if that's what the Court is getting, this estate consists of whatever --

THE COURT: Here's what I'm getting at. I'm trying to figure out what the statute means when it says expenses that are necessary to the preservation of the estate. I'm trying to figure out what is the estate. If the estate can be reasonably and legitimately conceived as an ongoing business that's actually operating and employing people and generating income and providing a service, if that's the estate, then I think this claim has more merit. If the estate is just the sum total of the assets of the business, whatever they are, then it's hard to see how this would be an expense necessary to maintain that.

MR. AVANZATO: I think I understand your Honor's question. Thank you for the clarification.

Your Honor, upon the filing of a receivership action, the estate comes into an existence. And what the estate is, is everything that the debtor had been. So the estate consists of all of the tangible and intangible assets, the going concern. Whatever value is added during the course of a receivership proceeding, it is everything that existed during the

time of the filing and everything that transpires thereafter.

So in this case, your Honor, I would submit that the estate includes without question the going-concern value of the nursing home. And even, your Honor, even if one were to use a narrower definition of "estate" and say it consists solely of what could be called true assets, there is no question that the going-concern value is, in fact, an asset. Whether a business is in a receivership proceeding or not, it is certainly recognized that the value of the business is greater when it is still operating than when it is shut down regardless of the existence of an insolvency proceeding.

Your Honor, the second issue I'd like to hit on is the value that should be put on the administrative claim. As I noted earlier, your Honor, the release would enable the sale in return for a value of in excess of ten million dollars. Through a liquidation pursuant to the papers that have been submitted, including the receiver's papers, the expected return would be millions of dollars less.

So, your Honor, it is not to exaggerate to say that the release would provide millions of dollars of value to the receivership estate.

Furthermore, your Honor, the $900,000 in question would be a direct result of Mr. Giordano's efforts to bring that money into the estate. That money is not part of what is coming to the estate separate and apart from Mr. Giordano's release. It was negotiated, and it's strictly and exclusively in return for that release.

I read Mr. Brown's affidavit on behalf of the Government where the Government speculates that perhaps the $900,000 is not directly related to the release but rather is the going-concern value over and above the ten million dollars.

With respect, that's simply demonstrably false. As the receiver has in his papers and is in the declaration, if this facility is sold at liquidation, that is, not as a going concern, the return will be millions of dollars less.

The going-concern value is the reason for that. The going-concern value of this is worth millions of dollars. An example of that would be the recent Hillside receivership case in which the relatively new building was sold just for five and a half million dollars without any going-concern value because the facility had been shut down.

There's simply no basis to assert that $900,000

is connected to anything having to do with the value of the facility. It is exclusively connected to the release.

And your Honor, that pool of money was created by these negotiations by Mr. Giordano, and it would not otherwise exist but for the issue of the release.

For those reasons, plus the benefits of the estate are the reasons why we assert that $900,000 is the appropriate amount for the administrative claim.

There are a number of other points I could raise, your Honor. I think, though, I will rest at this point unless the Court has questions and then respond, perhaps, to what the Government has to say.

THE COURT: All right. I think that's appropriate.

MR. AVANZATO: Thank you, your Honor.

THE COURT: Thank you. All right. Before Mr. Brown states his objection, is it appropriate to hear from the receiver first?

MR. FERRUCCI: Your Honor, good morning. Joseph Ferrucci, the court-appointed receiver.

Your Honor, before I get into the specifics of the argument, I'd just like to confirm a couple of understandings and make sure that the record is clear.

Firstly, the receiver had received an offer from

American Senior Living Companies, and that offer contained within it, in addition to other terms, a provision that $900,000 would be paid to the estate. That offer also contained a term which required approval of that offer by a date certain. That date has come and gone. And just so we're clear on the record with ASLC and that we're not doing this for the intellectual exercise, I wanted to confirm for the record, and if there's any objection to that I'd like it to be heard today, that that offer is still a viable offer and my understanding is that in the event that this administrative claim is approved that the ASLC will move forward with that offer notwithstanding that provision that allows for termination and that we will move toward a closing event.

THE COURT: That would come in the form of a motion to approve the sale, right?

MR. FERRUCCI: It will eventually, your Honor, and there is a pending motion that has, in effect, been transferred into this court from the state court, but I think it's important that that confirmation be obtained today so that your Honor isn't wasting any of his time in considering these issues.

THE COURT: Sure. Mr. Savage, can you come up and speak to that question on the record.

MR. SAVAGE: Jonathan Savage for American Senior Living. Yes, your Honor, as of this time, my client has not instructed me to exercise its rights under the offer to withdraw. That's different, however, from agreeing to amend that offer to be bound going forward, but I will tell you that it is a present intention as of now to go forward with that offer as presented, as modified with respect to the $900,000 subject to the adjustment for the Woonsocket tax issue. That's why we're here, and we're hoping that we will be permitted to go forward and consummate the sale. But I have not asked, nor have I received authority to amend their offer to delete their right to terminate at any time.

MR. FERRUCCI: Your Honor, that's fine. I'm not asking them to otherwise change an offer that they currently had made and the terms of it. I just wanted the representation made that, as we stand here today, the offer that has been presented is still a viable offer. There's been no withdrawal of it and that the offer is viable with the one modification that's been now maybe ad nauseam presented by Mr. Savage that the $900,000 would be subject to the claims of the City of Woonsocket, whatever preference they might have, if any, to those.

MR. SAVAGE: Your Honor, I would consider our

offer a viable offer, and it's our intention to go forward under the terms of that offer barring any unforeseen changes.

THE COURT: If it's satisfactory to the receiver, then that seems fine to me.

MR. FERRUCCI: Thank you, your Honor. In addition, your Honor, I want to clarify one point with respect to Mr. Giordano, and that is my understanding is that in the event that this Court would approve the administrative claim, in consideration, in effect for the approval, Mr. Giordano would provide, in connection with hopefully an upcoming sale, releases to both the receiver and to ASLC, not necessarily payment on account of that administrative claim but approval of it as an administrative claim and that it's Mr. Giordano's risk relative to payment; i.e., in the event this Court would approve the administrative claim and allow it priority relative to the Internal Revenue Service or anyone else in payment of it is not a condition to provide new releases. And I would ask for confirmation as well for the same reason that I'm asking --

THE COURT: You need that confirmation from Mr. Giordano's counsel, right?

MR. FERRUCCI: That is correct, your Honor. I believe I've had conversations but, again, I would like

to make it clear for the record, please.

THE COURT: I think that's worthwhile.

MR. AVANZATO: That is correct, your Honor. That is what we say in all our papers.

THE COURT: Now, let me ask you one question I should have asked while you were up here.

The liability of Mr. Giordano is in excess of $900,000 to the IRS, right?

MR. AVANZATO: The IRS claim is in excess of $900,000, your Honor, yes.

THE COURT: So if this claim is approved and there's a $900,000 pot set aside, and that $900,000 is subject to claims by the IRS and by the City of Woonsocket for water and sewer taxes, et cetera, what comfort does Mr. Giordano get out of that? Doesn't he still owe, assuming the IRS -- just assume for purposes of this question, I'm not asking you to concede it, assume that the IRS's claims are correct and enforceable, how does this help Mr. Giordano other than maybe cutting the liability down by whatever the IRS gets?

MR. AVANZATO: There are a number of issues there, your Honor. One is this. Mr. Giordano does not concede that the IRS would have a lien on that $900,000. Mr. Giordano also does not concede that the

IRS, if it does have a lien, that its lien would trump the lien of other secured creditors of Mr. Giordano.

So the question of what does Mr. Giordano stand to gain, well, the money is not necessarily going to go to the IRS. And hope springs eternal, your Honor. We've been attempting to get a counteroffer from the IRS. Maybe someday that will happen; maybe not, but there are two prongs. One is maybe the IRS will get the money; maybe we can do a deal with them. On the other hand, maybe the IRS will not get the money.

THE COURT: I'll confess my ignorance, which I have to do a lot in this field, but I always thought the tax liens from the IRS came first. That's what I remember learning in law school. Am I wrong about that?

MR. AVANZATO: I would never say your Honor is wrong. I would suggest that perhaps there's some shades of gray there.

For example, your Honor, it is not necessarily the case, and in fact, we will be asserting that the IRS does not have a tax lien on this $900,000 for reasons that we'll be arguing in subsequent stages of these proceedings if the administrative claims are approved. So that's the first question, the first issue. The IRS lien might not attach.

There are also circumstances, your Honor, when an administrative claim would trump a lien as to certain collateral. The bases for that argument would also come later. There's another argument that pre-existing liens could trump the lien of the IRS.

So there is no rule that the IRS always wins. It may seem that way, but, in fact, there are arguments that can be made to defeat the IRS on a number of bases.

THE COURT: Okay. Very good. Thanks.

MR. AVANZATO: Thank you, your Honor.

MR. FERRUCCI: Your Honor, if I may address an issue that your Honor raised a couple of minutes ago with Mr. Avanzato in what constitutes the estate. It is clear that the estate consists of those things typical of corporate ownership of assets such as receivables, cash, intellectual property, things of that nature. But many times in these proceedings, whether it be state court receivership proceeding where the court has authorized operations or whether it be in an 11 and much more unlikely in a 7, there are clearly benefits to continuing operations to preserve what we call going-concern value. And unquestionably, going-concern value comprises sometimes, many times the largest component of the estate.

And I can represent to your Honor that on many different occasions in both the state court and in the Federal Bankruptcy Court that were it not for continuing operations of the business, an environment in which the claims are pre-petition or pre-receivership creditors are put at bay, with a breathing opportunity for the company to stabilize its operations and to maintain operations on a go-forward basis, the results would be catastrophic, if you will, for creditors.

So in this particular situation, Judge Silverstein, after hearing extensively from counsel on issues like why is a receivership necessary, and one of the representations at that time as to why a receivership was necessary was because the company had insufficient cash to allow it to continue to operate, one of the reasons why the order appointing me receiver in the state court proceeding allowed for continuing operations was the recognition, I believe, your Honor, of the fact that continuing operations would preserve value in addition to the incidental things like avoiding the necessity of a closure and decertification and moving residents.

So I don't think anyone can dispute the fact that the estate is comprised of many aspects, probably

the most significant of which is going-concern value.

In addition, your Honor, and again I've submitted a four- or five-page paper. My approach has been much more practical in this, your Honor. I don't believe this Court is limited to the strictures of Section 506 of the Bankruptcy Code. This is not a federal bankruptcy proceeding. This is a federal receivership proceeding similar to the state court receivership proceeding. This Court, I think, can look to 506 for guidance in connection with administrative claims. I believe both sides have very well articulated what 506 requires by way of, if you will, benefit. I think both sides have acknowledged that the list of administrative claims contained therein is not exhaustive.

However, at the outset of this matter when this Court decided to appoint me as receiver, I had provided a list of some cases. And one of the cases that was cited was the case of J. P. Morgan Chase Bank, which is a 2007 West Law 2608827, which is a Northern District of Illinois case, 2007, for the general proposition, your Honor, that this Court has the authority, equitable authority to appoint a receiver and to, on a very broad basis, utilize its equitable powers to allow it to fashion remedies that are designed to protect the

interests of creditors.

And again, ironically here, I understand the Government's position, and I believe that they may be operating from a much wider platform. I don't think there's anything particularly intentional about why they're doing this because it's Giordano.

Unquestionably, they have a much wider policy concern, but I think given the unique nature of this case, the very particular facts of this case, a ruling by your Honor granting an administrative claim can be justified given the fact that, if it is approved, we move forward with a sale process, which might generate $900,000, which the IRS lien might attach to, which other creditor claims might attach to.

So the receiver's approach is practical. It is one where don't kill what we're trying to preserve. And I say that in a way where I don't think, your Honor, that if we step back and we get away from the policy issues, I don't think anybody can argue it makes sense to create $900,000 in this estate to, by the way, get a secured creditor that's owed $9.3 million in a position where we'll have an assumed loan obligation certainly with a better prospect of continuing payments if the operation continues as a going concern, and all of the other benefits, if you will, that are contained

in the offer approved.

So again, I think that given the unique circumstances here, this Court is well within its broad equitable powers to allow the administrative claim given the articulated basis for the benefit that's been presented by Mr. Avanzato.

Your Honor, there is, I think, another point I'd just like to highlight upon. I mentioned it earlier. This is not a motion to approve administrative claim and request for payment of that administrative claim. It's simply a request to approve the administrative claim. We've cited cases for the proposition that germanely a receiver's issue to determine whether a claim of this nature should be allowed or not, unquestionably, if that administrative claim is being sought to prime a secure claim, anyone who is impacted by that should have the right to come back before this Court and object to the priming of that claim.

As a general proposition, the allowance of the administrative claim has no effect on the secured claim until there's an assertion by it. And let's not be naive. I believe that assertion might be coming at some point but it's just not here yet.

So to, again, kill the golden goose on the argument that we might be primed by an administrative

claim someplace down the road, I just don't think is --

THE COURT: That's your argument that the Government doesn't have standing to -- your argument I'm not sure, somebody argued this. The Government doesn't have standing because --

MR. FERRUCCI: That's correct, your Honor. To get a little bit more technical about it, the primary secured creditor is not the Government. Everyone acknowledges the mortgage liens record prime the liens of the federal government based upon timing.

So if this offer doesn't go forward, your Honor, and I mentioned this in chambers, I've got a copy of the appraisal with me today because I know that it was something mentioned in the Government's papers, the appraised value of this asset is less than $5 million.

Not only is the first secured creditor under-secured, it's partially secured, in effect, because it's owed almost ten million dollars, but unquestionably the Government is under-secured.

And again, I've tried to keep this as a practical argument, but technically, as an under-secured/unsecured creditor, if you follow the argument that this agreement should not go forward as drafted in effect by denying the administrative claim, there's no value, there's no collateral, there's

nothing that secures the IRS's position here, unsecured.

So to allow, in effect, an unsecured creditor to make decisions regarding administrative claims based upon our reading of the case law is inappropriate; it's a function of the receiver, and the receiver should be in a position to make the recommendation on allowance of the claim. And in the event that, your Honor, in the event that there's a sale, and we've taken it from the hypothetical and brought it into the real life scenario where there's now $900,000, then at that point the IRS may have the right to take the position that their lien attaches and is senior to anyone else's lien. But until that happens, if you follow from the Government's argument, they're unsecured, Judge.

Your Honor, again, I've mentioned a few other things in my papers. If your Honor has specific questions with respect to those, I won't belabor the point that this is, obviously, a unique situation where we have the risk of 150 plus patients being in a position where they'd have to be moved. Again, just for the record, local families, many of the relatives of the residents at this home walk to see their parents, grandparents. It's a very community-oriented situation, and I strongly urge the Court to grant the

administrative claims for the reasons I've stated.

THE COURT: Thank you, Mr. Ferrucci. All right. I'll hear from the Government.

MR. BROWN: Good morning, your Honor. Your Honor, the receiver and Mr. Giordano have strongly emphasized the fact that if this administrative claim were approved, a sale of the Mt. St. Francis healthcare facility pursuant to the terms of this particular purchase and sale agreement with this particular buyer might go through. But, your Honor, the law on administrative expense priority is not that under circumstances such as those you get an administrative claim. There is specific law on what an administrative claim is, your Honor, and it's based on the policy that a receiver or a bankruptcy trustee should, in protecting and preserving the estate, be able to obtain credit from third-party suppliers of goods and services in order to maintain the estate. So for example --

THE COURT: What law are you referring to? Because I'm looking at the statute, and that's what really drives my decision and that's why I asked the questions that I asked. If something is a necessary expense, that's what the statute says, to preserve the estate, then it seems to me it can be an administrative claim.

Now, what law is it that you say makes that not so?

MR. BROWN: Your Honor, I don't dispute that the estate can include the business, the business itself, and that preserving the estate can include continuing -- can include the expenses of operating the business.

My argument is that an expense of selling the business to a particular buyer, in this case American Senior Living, is not -- that's not preserving the estate. That's selling the estate. And I'm not aware of a single case that says that selling estate property or business of an estate can be an expense under 503(b)(1)(A). The expenses of hiring somebody to help you sell estate property, whether you can get that as an administrative claim is governed by 503(b)(2), and 503(b)(2) refers to 327 and 330 of the Bankruptcy Code under which the receiver or the bankruptcy trustee can only hire a disinterested person.

So if the receiver or the bankruptcy trustee needs to hire an appraiser or an auctioneer or a real estate broker in order to sell assets of the estate, they have to go out and find a disinterested party and hire them with court approval and do it that way. But under 503(b)(1)(A), you're strictly limited to

preserving the estate, meaning preserving the assets, or, if it's the operation of the business, operating the business.

So paying the wages of the employees of this nursing home would be an administrative expense or whatever other contracts the receiver needs to enter into in operating the business would give rise to an administrative claim.

THE COURT: But don't we know as pretty much an irrefutable fact that if this sale doesn't go through, the business is going to close and the estate will be liquidated?

MR. BROWN: Your Honor, there is no evidence of that on this record. We don't know that. It may be that the estate has value as a going concern and that's why ASLC has submitted an offer to buy it. And it may be the receiver can solicit bids for the facility and for the business from other potential buyers.

The test, your Honor, is whether it's an expense of the receiver operating the business. And it's dependent on there being a contract between the receiver and a supplier in operating -- in continuing the operation of the business, which brings me to another just basic point here. We're talking about whether this is an administrative claim. And

obviously, if you're going to have an administrative claim, you have to have a claim against the estate. You have to be a creditor of the estate. 1015 of the Bankruptcy Code defines a claim very broadly as a right to payment. And a right to payment comes from a transaction either pre-petition with the debtor or post-petition with the receiver or the bankruptcy trustee.

THE COURT: Doesn't it say -- the statute doesn't say claim, does it? It says an entity may timely file a request for payment of an administrative expense. And then in (1)(A), actual necessary costs and expenses of preserving the estate. So it doesn't say it has to be a claim as defined by whatever that section.

MR. BROWN: Your Honor, as I read the administrative claim priority in the Bankruptcy Code, the purpose of the administrative expense priority is to give certain creditors, namely, suppliers who have entered into contracts with the trustee as part of the administration of the estate priority as creditors over other general unsecured creditors of the estate.

I think it's absolutely the case that you have to be a creditor of the estate in order to make any kind of claim against the estate, and I don't see why

that wouldn't also be true for an administrative claim. But I've already strongly argued that under the exact language of 503(b)(1)(A), and the cases interpreting that provision, preservation of the estate means a receiver protecting the assets of the estate, preserving them, operating the business. And when you see courts and bankruptcy treatise, Collier on Bankruptcy, describing what administrative claims are, those are the types of expenses they identify.

And I've looked for cases saying that the cost of selling the business of the estate or even property of the estate, even specific assets are administrative expenses under 503(b)(1)(A) and I just couldn't find them.

And Mr. Giordano, the plaintiff, cited to a couple of decisions saying that the costs of hiring a real estate broker in one case and an auctioneer in another case were administrative expenses.

They were administrative expenses; however, they were administrative expenses under 503(b)(2), and they were granted administrative expense priority based on 327 and 330 or its predecessors saying that you could hire people like that if they're third-party disinterested persons.

I'd also like to bring the Court's --

THE COURT: Just a second. Let me ask you this. Are you suggesting in any way, and I don't think you are but I just want to be clear, are you suggesting in any way that any of the parties involved here, and particularly the receiver, has acted inappropriately, or are you suggesting that there is some kind of inside deal that has been concocted here because you seem to suggest that, if this is not approved, then the receiver would go on and may be able to receive various bids and then determine who the best purchaser would be, and that this is an attempt to shortcut that.

Now, the representations that I have been getting from everyone involved, except the Government, is that there are two options here. One is that this deal is going to happen and that approval of this claim is a necessary predicate to that, or that the deal is not going to happen and then the nursing home is going to be closed and it's going to be liquidated.

So you're alluding to a scenario which no one else has described as a realistic possibility in this case. If you're going to stand here and tell me that that's what you're relying on and that may occur, that implies that there may be something else afoot here. I want to get this all out on the table right now. And if I end up disallowing this claim on the basis of the

Government's assertion that there's a third way here and it's going to be a competitive bid to run this nursing home, I want to know if that's real, or are you just sort of making that up?

MR. BROWN: Your Honor, I'm not arguing that the Court should deny the administrative claim because of my suggestion that there might be a third scenario. I don't know whether there's a third scenario. As I've asserted in an affidavit, I think it would be necessary for the Government to take discovery to ascertain that.

I'm asking the Court to deny the administrative claim on the basis of the law governing the administrative expense priority and the fact that this is not an administrative claim.

I'd like to just turn, your Honor, to the fact that in addition to 503(b)(1)(A), there are two requirements in the case law --

THE COURT: Would you just answer my basic question, which is are you suggesting in any way that anyone is conducting some kind of inside deal here or anything inappropriate?

MR. BROWN: Your Honor, the Government's view or my view based on the review of the original -- I should say the purchase and sale agreement is that it looks like ASLC and Mr. Giordano struck a deal to purchase

the assets of -- to purchase the business of Mt. St. Francis without any creditors of this receivership receiving any funds at all by creating a clever contract under which they would, arguably, be able to come before a court and say, look, if this administrative claim is granted, this sale is going to go through and these patients will be able to stay in a nursing home, and Mr. Giordano in his motion is attempting to prime the United States liens in doing that. He says, if my administrative claim is approved, this money is going to be paid to entities of which my children are the beneficiaries.

So Mr. Giordano is clearly attempting to undermine the creditors of the estate by claiming that the entire $900,000 closing payment, which is the residual amount to be paid by ASLC to a receiver under the purchase and sale agreement, he's coming and saying I should be entitled to that entire $900,000 even though I'm not even a creditor of the estate, let alone a secured creditor, and that's based on my post-petition deal with ASLC, the potential third-party buyer; it's not based on any deal between myself and the receiver, which is a specific requirement also of administrative claim status.

The case law says you need two things for

administrative claim status. You need a post-petition transaction with the receiver, which is obviously you're going to be required because you need to have a claim against the estate. And the second requirement is that the administrative claim has to provide a benefit to the estate.

It's clear here, even on Mr. Giordano's view of the facts, that there is no post-petition transaction with the receiver on which this administrative claim is based.

So to answer your Honor's question, it seems to me, based on just the contract itself and the submission of the administrative claim motion on the same day that the purchase and sale agreement was signed, that this was negotiated somehow to say, how can we structure this deal so that the creditors get nothing and the general partner who doesn't even have a claim as a creditor in this estate gets the entire closing payment. But your Honor, I don't want to rely on my --

THE COURT: There are other creditors in this matter, and they can object to this if they wish to do so, right?

MR. BROWN: Right. And they have, your Honor.

THE COURT: Well, who has? I have a limited --

I recall one limited -- I forget how it was phrased. Limited objection or -- who else has objected?

MR. FERRUCCI: O. Ahlborg and Sons has objected.

MR. BROWN: O. Ahlborg and Sons has objected.

THE COURT: I'm sorry?

MR. BROWN: O. Ahlborg and Sons.

THE COURT: That was characterized as a --

MR. BROWN: As a limited objection.

THE COURT: -- limited objection.

MR. BROWN: I believe that's for the reason that the United States is a secured creditor with filed federal tax liens in the amount of $6.5 million against this limited partnership. And it's clear that we are the primary stakeholder with respect to any funds that the receiver is able to generate through this sale.

THE COURT: What about all the other creditors you seem to be worried about?

MR. BROWN: I'm worried about the United States, your Honor.

THE COURT: Wait a second. You just said that this was a deal concocted that leaves all the other creditors out in the --

MR. BROWN: Particularly the United States.

THE COURT: Well, but that's not what you said. You represented that it was leaving all the other

creditors in the dark. And the only other filing I got was Ahlborg's limited and conditional objection. Now, there's a lot of other creditors involved in this matter, right?

MR. BROWN: Well, maybe they realize, your Honor, that this business is subject to our liens and we have first priority.

THE COURT: Well, but maybe they also realize, and why isn't it reasonable for me to assume, that all those other creditors believe that a deal like this that keeps the going-concern value intact is probably their best chance of getting any money out of this.

MS. NGUYEN: Your Honor, if I may speak on this matter, the United States on behalf of HUD has also filed an objection so --

THE COURT: I don't remember seeing that.

MS. NGUYEN: That was in state court, your Honor.

THE COURT: So you didn't refile it here? Okay.

MS. NGUYEN: No. I assumed that it was part of the Court's record as is the motion to approve the payment that was filed in state court.

THE COURT: Okay. Are there any other objectors?

MR. BROWN: O. Ahlborg and Sons, Suburban

Mortgage Associates.

THE COURT: Suburban?

MR. BRENNER: Yes, your Honor. On behalf of Suburban Mortgage, Jeffrey Brenner. And we filed a limited objection to the motion to approve the administrative claim of Mr. Giordano. That made its way to your Honor by Mr. Ferrucci who transmitted various pleadings to your Honor on this case from the state court matter.

Our limited objection just has to do with how the funds would be treated. We want the administrative claim to be approved because, short of that, there is no money to give to anybody. The IRS will get nothing. And I'll speak after Mr. Brown and give you reasons why.

The basis of our limited objection is we don't want Mr. Giordano to decide who would get the 900,000, or 750,000, whatever it is. We want it going into either the Court registry or an escrow with the receiver. If the IRS feels that it has a superior claim to anyone else on the planet to that money, then that money would be there for them and then they can assert that position in the claim and your Honor can decide that. And I think that, procedurally, is the appropriate action, and I'll speak more on that after

Mr. Brown.

MR. BROWN: Your Honor, I'd just like to cite to page two of Suburban's limited objection to Mr. Giordano's motion. At the very bottom of the page, Suburban asserts, (Reading:) It also does not appear that Giordano's debt to his children should be classified as an administrative claim.

Which brings me back to the point that I'm trying to emphasize, your Honor, which is your Honor doesn't need to consider whether my views of the deal made between ASLC and Giordano are correct. The point I'm making is that there is law governing what is an administrative claim in a receivership or a bankruptcy case. And under straight black letter law, your Honor, this is not a colorable administrative claim. It's not based on a post-petition transaction with the receiver. It's not in furtherance of the operation of the facility, the preservation of the estate. It's in furtherance of a sale of the entire estate to a particular buyer.

As I also mentioned -- sorry.

THE COURT: A receivership is an equitable proceeding, right? And doesn't this Court have considerable discretion and leeway when acting in equity to do what is right and in the best interests of

all those concerned?

In other words, isn't it within my equitable powers to approve this, whether it is strictly post-petition or not or maybe sort of post-petition or whatever, or whether it is further to the operation of the estate versus further to the continued existence of the estate for purposes of a sale that benefits everybody?

MR. BROWN: Your Honor, there's no question that the Court has the power to either grant or deny this administrative claim.

However, there's law governing whether it's an administrative claim. And furthermore, the Government's position is that equity demands that in administering the receivership, the primary equitable need is to ensure the proper priority treatment of the creditors of the receivership. And equity does not mean granting an administrative claim to a general partner who was never a creditor of the estate, is not a creditor of the receiver and --

THE COURT: I understand your arguments there. You seem to want to put the priority issue first and have that decided now, and I think what everybody else here is saying is that the time for that is later. And that seems logical to me.

MR. BROWN: First of all, we dispute whether this motion, in fact, is deferring a priority question until later. It clearly states that this claim is intended to go to Mr. Giordano's --

THE COURT: I can provide for that in an order. I mean, the order that I issue can very clearly articulate that this has nothing to do with setting the priority of any of the creditors and that any question about the validity or the priority of Mr. Giordano's claim vis-a-vis the IRS or any other creditor is reserved to a later time.

MR. BROWN: However, your Honor, the Government's position is that the determination that this is an administrative claim may impact upon whether the United States could claim a priority vis-a-vis this administrative claim.

THE COURT: So the worry is over the terminology? Is that what it is?

MR. BROWN: No, your Honor. My worry is over the law. This is an administrative claim if this Court says so.

THE COURT: I don't have to call it a claim. I mean, that's what the motion is, but I don't have to say that in my order. I can just track the language of the statute, which is this is a request for an

administrative -- for the payment of an administrative expense. That's what the statute says. And I can just approve the payment of an administrative expense out of the closing of $900,000. I don't have to call it a claim.

MR. BROWN: But, your Honor, an administrative expense -- if your Honor finds it's an administrative expense, your Honor has found that it benefits the receivership estate. Under the law, that's one of the criterion under Woburn Associates v. Kahn and other First Circuit law, it's only an administrative expense if it benefits the estate. If you find that it benefits the estate, your Honor, conceivably, we could be prejudiced in arguing that it did not directly benefit us as a lienholder with a lien against all property of the estate.

THE COURT: What if I find in my order that it does benefit you?

MR. BROWN: That it does benefit me? Then we would be primed by Mr. Giordano's lien.

THE COURT: Why wouldn't I just put right in my order that I approve the administrative expense and I find that it's to the benefit of all the creditors including the IRS?

MR. BROWN: Because then you would have found,

your Honor, that Mr. Giordano's administrative expense primes the United States' liens, and as I've attempted to argue, it's not an administrative expense.

THE COURT: So you don't want me to say that it benefits the IRS? I guess I'm confused.

MR. BROWN: Your Honor, in terms of administrative expense claims, there are general administrative expenses which the receiver or the Court has determined benefit the entire estate. Then there are administrative expenses that can be paid out of a secured creditor's collateral. Those are expenses that directly benefit the secured creditor.

So for example, if a secured creditor is secured by an interest in a piece of real estate, and say the estate is bigger than just the real estate, and the trustee hires an auctioneer as an administrative expense to sell off the real estate, that auctioneer's administrative expense could be paid out of the sales proceeds of the real property. It would be kind of a super priority administrative claim that would trump the secured claimants' administrative claim.

The test of whether -- in this situation, your Honor, the United States is secured by the entire estate. So if your Honor finds that this is an administrative claim which would necessitate a finding

that it benefits the entire estate, then the Government is going to be in a very difficult position in arguing that we were not or may be -- it may conceivably be prejudiced in arguing that we are not directly benefitted by this secured claim.

So there are consequences to the United States in terms of litigating its priority position based on whether your Honor approves this administrative claim. And that's obviously why I'm here.

And in addition, just as a matter of prejudice to the United States, litigating the factual question of whether this benefited the estate and whether it directly benefited the United States is a factual question. It could require discovery. It could require a trial. It could require witnesses, experts as to what the value of the estate would have been if this sale hadn't been to ASLC. Meanwhile, there are these legal arguments that we are asserting now that we assert are being made under black letter law and without factual determination, you can just look at whether this is an administrative claim. Does Mr. Giordano have a claim against the estate? Is it a necessary cost of preserving the estate for the receiver to pay Mr. Giordano the $900,000? Is there a post-petition transaction with the receiver on which

this administrative claim is based. And the Government -- it's a lot easier for the Government to assert those arguments then to litigate for months or years over whether we were directly benefited by the -- by what has already determined to be an administrative expense that benefits the entire estate.

THE COURT: Just so I'm clear on something, if I find that you are benefited by this approval of this expense, does that help you or hurt you?

MR. BROWN: Hurts us, your Honor.

THE COURT: If I find you're benefited, it hurts you?

MR. BROWN: Yes, your Honor.

THE COURT: In the assertion of your --

MR. BROWN: Yes, your Honor. The test of whether we or -- assuming the administrative claim were approved, if your Honor found that even the estate were benefited, which is what your Honor would have to find to find that it was an administrative expense under Woburn Associates v. Kahn, but particularly if your Honor found that the expense directly benefited -- if your Honor found that the expense directly benefited the United States, then that would constitute, effectively, a finding that the United States liens are primed by Mr. Giordano's administrative expense.

THE COURT: Okay.

MR. BROWN: Thank you, your Honor.

THE COURT: Thank you.

MS. DONOVAN: Your Honor, after Mr. Brenner is done, Ms. Nguyen would like a moment to address in short fashion HUD's objection to Mr. Giordano's motion, if the Court would so permit.

THE COURT: Okay. Go ahead.

MS. NGUYEN: Thank you, your Honor. Plaintiff's administrative claim in this case is in violation of the HUD regulatory agreement that was entered between HUD and Giordano and was dated July 13, 1995. And that is not the first time that Mr. Giordano has violated that regulatory agreement.

In fact, as the Court is well aware, Mr. Giordano was convicted of equity skimming, 12 U.S.C. 1715z-19, which specifically prohibits funds for any purpose other than to meet reasonable and necessary expenses. And that includes expenses approved by the secretary if such approval is required.

In this case, your Honor, as paragraph six of the HUD regulatory agreement states, the owner shall not without prior written approval of the secretary either encumber any of the mortgage property or encumber personal property of the project including

rent or pay out any funds except from surplus cash except for reasonable operating expenses and necessary repairs.

In this instance, your Honor, plaintiff's administrative claim is an encumbrance of the mortgaged property. Mr. Giordano threatened that he will not release ASLC from any liability --

THE COURT: Just tell me why HUD -- what's HUD's beef here? I'm not sure I understand it. I don't want you to repeat what other people have said.

MS. NGUYEN: HUD ensures over 9 million of the loan that -- of the Mt. St. Francis loan.

THE COURT: Okay. So if this deal doesn't go through, as I understand it, there will be a liquidation of the estate. It's valued at about $5 million, and the mortgage holders will get whatever they get. You insure that so you absorb the loss on that, right?

MS. NGUYEN: That's a possibility if all those events play out as far as --

THE COURT: Just explain to me, briefly, if you can, how that's better than this deal going through and having the mortgage assumed and HUD not having to absorb that loss? How is that?

MS. NGUYEN: Well, your Honor, that assumes that

all events will take place. Mr. Ferrucci was appointed receiver. He was given specific authorization, one of them was to potentially solicit buyers and such. So that assumes that there are no buyers out there. And I'm not aware of any buyers or the fact that any buyers were solicited.

THE COURT: Well, you have a buyer. They're right here in court. I mean, there is a buyer, right?

MS. NGUYEN: One buyer. Potentially there may have been other buyers. As one of the pleadings mentioned --

THE COURT: Well, then answer the same question that I asked to the Government. Are you suggesting that this is some kind of inside deal of some sort, that this is a preferential transaction between the receiver and ASLC?

MS. NGUYEN: Your Honor, when this receivership was originally filed in state court, it was on the same month that Mr. Giordano was -- there was an information filed, and he also pled guilty to equity skimming of --

THE COURT: I understand that. Answer my question. Are you suggesting that this is an inside deal of some sort, that there are other potential buyers out there who are being excluded from this process somehow by this deal? I want to know.

MS. NGUYEN: Mr. Giordano has raised the fact that he negotiated with another buyer even before this receivership was filed in state court. So are there other buyers out there? Potentially, yes, your Honor, from Mr. Giordano's affidavit.

THE COURT: But that's the basis of you saying that?

MS. NGUYEN: I don't have any other information with respect to if there were any other buyers, your Honor.

THE COURT: Okay. So it's on that -- that's the read, if you will, that you have here that holds up your argument that it's better for HUD to oppose this and take the risk of absorbing this insurance obligation than it is to agree with this and not have the risk of having that loss.

MS. NGUYEN: HUD opposes the sale, your Honor. Not the sale, I'm sorry. The administrative claim, your Honor.

THE COURT: I understand that. And it's based on this kind of syllogism that goes we oppose it because there might be other people who would compete to buy the property. And if there were other buyers, then what? I still don't understand how this benefits you.

MS. NGUYEN: If I can go back a little bit, your Honor, the fact is that when this agreement between ASLC and Mr. Giordano was entered, it was entered between the two without any kind of seeking any sort of approval from HUD, essentially, and now we're faced today with dealing with this prior agreement and ASLC submitting an offer that does not meet the conditions of that prior agreement. Therefore, had that prior agreement not been in place and had Mr. Giordano sought the approval of HUD, there wouldn't be an encumbrance of the property in the first place. There would be no breach.

THE COURT: Okay. So maybe what he did was wrong. I don't know. But you're willing to stand up here and say that we'd rather take a 5 million dollar or 4 million dollar insurance hit on the debt that you insure than see this transaction go through because we're mad that they didn't include us in the earlier negotiation? Is that what it's about?

MS. NGUYEN: It's about a regulatory agreement that has been violated. It's about encumbrance of a property and Mr. Giordano's refusal to respect that regulatory agreement.

THE COURT: So you're going to inflict a 5 million dollar hit on the taxpayers because you're mad

that Giordano didn't comply with the regulatory agreement? I mean, he's a bad guy. He's in jail. I know. But how does that make any sense?

MS. NGUYEN: Your Honor speaks of a 5 million dollar value.

THE COURT: I don't know. I'm using rough figures. You insure $9 million dollars in mortgages; is that right, something like that?

MS. NGUYEN: Over $9 million.

THE COURT: So you insure $9 million. There's other creditors out there. There's assets worth $5 million. I'm just kind of roughly saying that, you know, assuming that the mortgage lienholder got the $5 million, which is a significant assumption, you would be on the hook for about 4 or $5 million, right?

MS. NGUYEN: There's been verbal assertions of the $5 million. I don't think anything has been proved other than the verbal assertions with this Court that the value is, in fact, $5 million.

THE COURT: That doesn't answer my question. Let's just assume for purposes of my question that it's $5 million. You would rather see HUD take a $5 million hit because this regulatory agreement was not complied with than see the sale go through and not take the $5 million hit. That's what I'm hearing you saying. And

I wonder how that could make any sense for the taxpayers.

MS. NGUYEN: Yes, your Honor. HUD is not in the business of negotiating with convicted felons.

THE COURT: And that principle is worth hitting the taxpayers with $5 million; is that right?

MS. NGUYEN: I don't know if that's the worth of it. And that's certainly not HUD's fault.

THE COURT: That's just the way it is. Is that what you're saying? Okay. I think I understand your position.

MS. NGUYEN: Your Honor, I'm not saying that that's the way it is. I'm saying that HUD objects to this motion for the administrative claim, your Honor, on the basis of the violation of the HUD regulatory agreement.

THE COURT: Okay. Thank you.

MR. BRENNER: Your Honor, Jeffrey Brenner for Suburban Mortgage. I don't want to belabor some of the arguments, but I'm not sure where this proceeding will end up. And if it does end up in the First Circuit, I want to make sure that the record is clear as to various things that I know on behalf of my client and I think the Court should be aware of in order to exercise its equitable powers.

Suburban Mortgage issued two mortgages in this case, serviced them combined for about $9.3 million dollars, which is outstanding, which is part of this administrative -- which is part of its motion to approve secured claim.

I've been involved with Mt. St. Francis receivership for approximately two years. I've been involved with the Hillside receivership for almost three years and, to some extent, they are related.

Concerning Mt. St. Francis, the decision was apparently made by Mr. Giordano before the receivership to have an operator operating Mt. St. Francis so it would not close.

When Hillside went into receivership, there was no operator. It was quickly closed by the receiver who couldn't run it, which dramatically devalued the asset. American Senior was one of the interested buyers of Hillside Nursing Home. It then withdrew because it became involved with Mt. St. Francis. I don't know if there was anything nefarious between Mr. Giordano and American Senior. I have no reason to believe that there was, other than the fact that in order to preserve the value of the asset, it had to be operated.

As far as equitable grounds, Mt. St. Francis has been in Woonsocket for decades. I am personally from

Woonsocket originally, so I'm familiar with the facility. I've been inside it. I know many people who work there and whose family members are residents there. It is of extreme value to the community. It has a census that is always in the high 90 something percentile, which is remarkable for a nursing home.

The receiver mentioned that there's over 150 residents there. Many generations of people in families, as they get older, they go there. Many generations of workers work there. Those are some of the equitable factors that I think your Honor has to consider depending on what might happen after today.

Now, American Senior stepped in and they had a pre-petition agreement. Suburban Mortgage was not notified of this pre-petition agreement or of the receivership proceeding until after the fact. It's my understanding that HUD didn't learn until after the fact as well. But we knew about it pretty soon after the fact, and Suburban Mortgage was very happy that we had an institutionally known operator such as American Senior Living that came in and they were making payments on the mortgage; they were operating the facility appropriately and no one has ever disputed their bona fide operations of the facility.

Recently, as this matter dragged out for about a

year and a half, American Senior, with Judge Silverstein's approval, did not pay a mortgage payment. And they didn't do that because they said that they were getting strangled by the cash outflow. I objected to that request. It wasn't done in a motion. It was done by conference. And I said at the time to the court that bad things would happen. The bad things would be a domino effect of default notices because Suburban had assigned its mortgage to Midland pursuant to an agreement that Suburban had with HUD in order to wind up its business affairs.

So Midland is the servicer and owner of the mortgages.

Now, behind Midland, and Mr. Nolan identified himself earlier in this proceeding on behalf of White Mountain Advisors, is an investor. The way HUD works is that HUD guarantees these mortgages for the various facilities. There are companies who service them, whether it's Suburban or Midland or there's other companies in the area. Then there are investors who invest money so these mortgages could exist and they get whatever pre-approved rate of return or profit on it. They're not from Woonsocket. They're not from Rhode Island. They're in it for strictly a business purpose, and it's legitimized by the rules and laws of

the United States Government to allow a lot of cash to come in so that the nursing home facilities can exist throughout the country.

The Midland folks have notified HUD of its displeasure with the interest payments not being made. It has submitted a letter assigning the mortgage back to HUD under the guarantee program.

HUD has yet to determine whether or not it's going to accept that letter, and I don't know the timetable for when Midland expects HUD to get back to them or when HUD intends to get back to Midland, but assuming that the timetable would play out, HUD would have to step in, into the shoes and make Midland whole.

If this motion that Mr. Giordano has filed is denied by the Court, what's been represented to your Honor in chambers and what's been discussed amongst counsel outside of court in order to try to get to a resolution is that American Senior has said that it's done. It can't continue to move forward with this and the receiver has said he may be in a position to liquidate the asset.

While we have representation by the receiver that there was an appraisal for approximately $5 million for this asset, and I know that representation to be accurate, the appraisal was done more than a year

ago, which under USPAP guidelines would make it inapplicable. As your Honor has seen in the marketplace, as we all have seen in the marketplace, real estate values have not held their own in the last year.

That appraisal was also made of a facility that was as a going concern and operating. If we have a facility that is not of a going concern and the patients have their lives disrupted and are moved to other facilities and the workers leave and you board it up, similar to what happened to Hillside, I submit to your Honor that you will have an estate which is valued at much less than $5 million, and certainly much less than the secured claim.

Now, the secured creditor is the majority creditor of the estate. Under the terms of the pre-petition agreement that American Senior entered into, it would pay off the secured creditor through a refinancing with HUD. And American Senior is prepared to move forward after today, if this motion for administrative claim is approved and it's assured it can get a release from Mr. Giordano, because it doesn't want to get involved in litigation forever with Mr. Giordano or with anyone else. They want to operate this nursing home. If that happens, then the big

secured creditor is going to be paid off, and then I go away, Midland goes away, Mr. Nolan goes away, American Senior has said that they would quickly make the defaulted mortgage current. They're not going to pay it off right now, but they'll bring it current so that you don't have Midland and the investor and Suburban unhappy about the situation. And that's how you move forward. And your Honor has, I think, already understood that that benefits HUD. It won't have to have its insurance program debited millions and millions of dollars to make the investor whole.

I understand the U.S. Attorney's Office displeasure with Mr. Giordano. He's in jail for equity skimming. You can call it lots of things. I'm sure that the U.S. Attorney's Office on behalf of the IRS will aggressively pursue whatever claims that it has against Mr. Giordano before this Court. But for the IRS to say that the creditors don't want this and that they'll be prejudiced by it, I can't agree with that. He's really just speaking for the IRS for reasons which are best left to him. But for the big creditor out there, who is the secured creditor, they want this to happen so that the secured creditor can get paid off.

With respect to O. Ahlborg, I know there's no one in here for O. Ahlborg's attorneys today, but

they've participated in the conferences before, your Honor, and again their only objection has been that if there's money available at the end of day to Giordano and if the IRS doesn't get it first, they want a shot to pick up the crumbs that's left, as does Suburban, as does probably other creditors out there, but that's something that can be done under the auspices of this Court.

With respect to what could happen, we know that there's not a huge market in nursing home providers out there looking to buy up nursing homes. In the Hillside receivership, the bidding came down to two providers, Radius Management, and then the other interested entity was Davenport Realty that didn't want to do a nursing home. They wanted to do condos at Hillside, which is the old Jewish Home for the Aged. They did that up, a closed facility for $5.5 million, a facility which greatly dwarfs Mt. St. Francis. It's much bigger. It's in a better area. It's in Providence. It has, just as a bricks and mortar concern, it's a lot more of an asset than the bricks and mortar of Mt. St. Francis.

And if your Honor does not approve this motion, really bad things will happen. And your Honor and I think some of the parties in this case are getting hung up on the term "administrative claim." Your Honor can

very easily deal with all those issues in an order. It can approve the motion, but your Honor can make very clear that it is not giving any priority right to Mr. Giordano and that he would have to still prove everything necessary in order to I think the word Mr. Brown uses was prime the IRS. And I think the IRS can certainly present its case and not be prejudiced in any way to move to get a priority or to grab any of that money that would be available in an escrow.

I'm available for any questions, if your Honor has questions regarding, you know, the relationship concerning the secured creditor in this case, but I wanted to make the record in case this goes somewhere else.

THE COURT: Are you aware of any other potential bidders out there that would possibly suggest that this deal should be stopped so that the receiver can go out and solicit bids?

MR. BRENNER: The easy answer is no, I am not, but I want to explain why I'm not aware of it. I've been involved with these nursing homes now for three years, almost three years between Hillside and Mt. St. Francis.

When Hillside incurred incredible expense that my client paid to advertise that it was for sale, much

bigger facility than Mt. St. Francis that would be more attractive to the institutional nursing home providers, there was extremely little interest. Essentially, the bottom feeders came out wanting to develop it into something other than a nursing home. You know, there were plenty of people out there that would pay a million dollars for the facility. Based upon my experience with Hillside and with this case, you're not going to find in this market any other nursing home developer to payoff the secured creditor in full and to create a small pot of money, call it 900,000 or 750 or whatever it is for the IRS to try to grab onto.

So I think -- and this American Senior is also going to pay the administrative expenses post-petition incurred by the receiver and others that were legitimate to maintain the facility. I don't think you're going to find anyone else that would step into that deal. You might find a bottom feeder, but you're not going to find anyone in that range. Thank you.

THE COURT: Thank you, Mr. Brenner.

MR. SAVAGE: Your Honor, it was my intention to come here today and remain silent because in large part American Senior Living doesn't have a dog in this fight. But not once but twice I've heard negative aspersions with respect to my client, and I just think

I need to set the record straight for that.

I think it's important to look at how American Senior Living came to enter into an agreement with Mr. Giordano at all.

My client, through their related entities, operates nursing homes on a national basis. They have a national senior management team. They consider themselves experts in the area, and Rhode Island was an area that for whatever reason they have targeted as appropriate for them to direct their management skills and acquire multiple nursing homes. I'm aware of at least three, maybe four that they've been actively pursuing.

When they brought me on board and they began speaking about their discussions with Mr. Giordano, it raised many issues. Number one, and most importantly, they did not want to directly enter into a business transaction with Mr. Giordano that could not be consummated immediately.

The nature of nursing home operations are such, and particularly with a HUD assumption, that it's not possible to acquire such an asset immediately the way you would buy a building or another business, and the reason for that is you need regulatory approvals. And those regulatory approvals can take many months of HUD

and Department of Health.

That was further complicated by the fact that, as we all know, Mr. Giordano was soon to be relocated out-of-state and in incarceration; and furthermore, the operation of Mt. St. Francis was in such dire straits that it could not continue for that approval period without serious professional management and an infusion of many hundreds of thousands of dollars.

We came to the conclusion that the only way we could get stability of that asset was to have an agreement by which the home would be placed in receivership because then my client would not be dealing with Mr. Giordano or any of his representatives. They would be dealing with a court-appointed receiver with court approval and court supervision. And we felt that that cleansed the operation from our standpoint. Candidly, it was the only way we would go forward.

Mr. Giordano was concerned that if it went into a receivership we would have no obligation to bid what, by all accounts, is a very, very generous amount. You might ask why would someone pay more than they had to pay, and the reason was it's a small piece in a larger plan that my client had developed, and they feel there's value there for whatever reason, either they

can run it better and generate more profit or provided a toe-hold into this market that they wanted to enter into.

So Mr. Giordano was concerned that my client not get it into receivership and offer less than a certain amount of money. And my client was happy to agree to that agreement because it was a price they were willing to pay, and they were willing that if it meant paying that amount, they were happy to do it and they weren't going to pay less. So they would just abandon the project. And it also provided a mechanism by way they could inject the needed cash and management and supervision on a priority basis as opposed to just giving that money to Giordano with the hope that they would ultimately get the approvals necessary.

So that's how we ended up in the receivership process. No one, also, has mentioned that the original agreement for my client's purchase was not only the purchase of the assumption of the HUD mortgage, the agreement to pay receivers, some selected receivers' administrative costs, but there was originally a $2.2 million payment that was to go to the IRS. That was 18, 20 months ago, 22 months ago.

There's no nice way to say this, but it was, in my opinion, through the lack of follow-through, the

lack of response, the general incompetence of the IRS and the Government that that money was frittered away. We could not get a response. I tried, my office tried, Mr. Ferrucci I believe tried, others tried. Mr. Giordano's counsel tried, and we couldn't get a response.

And I think you'll recall at one of our hearings one of the lawyers for the Government said we never knew about that. Well, it's right in the papers. It's right in the documents. There's no secret. Near as I know none of the money was going to Mr. Giordano. It was all going to the IRS.

But what happened was, instead of having a three or four or six-month operation, my client ended up having to operate this facility for more than a year than they ever wanted to, and it significantly changed the circumstances.

So that's how we ended up in the receivership arena, and I think it's important that the Court know that it was done so at my client's urging so as to not have the negative aspersions that have come out today, notwithstanding the real facts. I don't know if your Honor has any questions.

THE COURT: No. I think I understand. Thank you.

MR. SAVAGE: Thank you.

THE COURT: All right. Mr. Avanzato, you wanted to reply to the arguments that were made here.

MR. AVANZATO: Your Honor, with the Court's permission, I'll be brief. Just a few points I'd like to make.

Let me begin with the aura of inappropriate conduct. I don't know what is being said by anyone about that. I listened very carefully to the Court's question; I listened carefully to counsel's answer. I don't know if anything is being said, but if it is, it's categorically denied for purposes of the record.

I cannot figure out precisely what they're saying, but we preserve all our rights in terms of whatever it is that anyone is alleging, albeit certainly not clearly.

I'd like to proceed to the far less incendiary issue of the law. Four points I'd like to make, your Honor. One is with respect to the HUD regulatory agreement. In their papers and today's argument, HUD cites to paragraph six of the regulatory agreement which they say prohibits transfer of any personal property of the project or payout any funds except from surplus cash except for reasonable operating expenses and necessary repairs. I'm not going to belabor this

point. It is our position that there was no violation of the regulatory agreement, that the $900,000 in question does not fall within the scope of personal property of the project. It's not resulting from a sale of the facility; it's resulting from the release and that there was no violation of the HUD agreement.

On the issue of administrative claim points, your Honor, there is no statute and there is no case law that would prohibit the allowance of an administrative expense in connection with a particular sale as opposed to sale in general. There is no such prohibition.

Second, your Honor, there is no prohibition on an administrative claimant or a petitioner for approval of an administrative expense coming to the court seeking approval before the acts are done. There is no prohibition on pre-approval from the court.

And third, your Honor, we're asking this Court to approve the administrative expense. Whatever ramifications there may or may not be on subsequent proceedings as to whether or not the IRS ultimately wins the money or Mr. Giordano or someone else, I would respectfully suggest so be it to the extent that the tail should not be wagging the dog.

We are here today on the issue of an

administrative expense, and we submit that we have met the standard, and we ask the Court to approve it. Thank you very much.

THE COURT: Thank you. Does anyone else wish to say anything? Mr. Prignano?

MR. PRIGNANO: Your Honor, just briefly on behalf of Midland, we join in the arguments raised by Mr. Brenner, particularly with respect to his suggestion that the Court could craft an appropriate order to preserve the rights of the parties with respect to any issues of priority at a later time. Thank you.

THE COURT: Thank you. For White Mountain, do you wish to say anything?

MR. NOLAN: We didn't plan on saying anything.

MR. BROWN: May I make a brief point?

THE COURT: Make it brief.

MR. BROWN: Your Honor, I just wanted to note that there's been a lot of speculation today about what's going to happen if this administrative claim is approved. I'd just like to point out that it's not clear what's going to happen. We don't know. Maybe ASLC is going to make another offer without the release.

Based on the contract, the nursing home

agreement entered into pre-petition does not -- I don't see why it would be worth ASLC's $900,000 to get this release. If you look at the contract, Giordano's rights in case of a breach of that agreement appear to me to be spurious. All the ASLC said is that we might make an offer. It didn't say we have to make an offer, so there could have been no expectation of Mr. Giordano that ASLC would end up paying off all of these IRS liabilities.

In any case, your Honor, there's been a lot of talk also about this nursing home and the need to keep the patients in the nursing home. And I'd just like to point out to your Honor in terms of the equities, look at the position that Mr. Giordano is putting the Court in. He's coming in and saying, your Honor, grant this administrative claim, but have a light reading of administrative claim law. It's not the big issue here. Grant this administrative claim, because if you don't, these patients are going to be thrown out on the street.

Essentially, he appears to be using the public interest in the continuation of this facility to dictate how this receivership is administrated and to say that we have to ignore the law because of this nursing home, and I would encourage your Honor not to

succumb to that.

THE COURT: All right. Thank you.

Mr. Ferrucci, I have a few more questions for you.

I want the record to be crystal clear on the issue of whether proposed sale to ASLC is in any way a preferential inside deal for some preferred entity and whether there are any other potential buyers out there, that if this were denied and you were to go out and put this out to bid, that other people would come along, which is sort of, I mean, what I hear the Government asserting would maybe happen. So could you speak to that a little bit, please?

MR. FERRUCCI: I will, your Honor. I can say that this appraisal that's been referenced was something I intended to have submitted and then have someone from my office actually examine me with respect to it at the motion to approve sale. I do have a copy of it with me today. I'd be happy to hand it up to your Honor.

THE COURT: We could make it part of the record.

MR. FERRUCCI: While that's being marked , your Honor, I'm fairly confident that copies of that appraisal were previously provided to the Government. If for whatever reason they don't have copies, I'd be

happy to provide copies today.

THE COURT: All right.

MR. FERRUCCI: Part and parcel, your Honor, of that appraisal are three different methodologies of valuation, none of which exceeds $5 million. There's an income approach; there's a cost of comparison and direct sales approach, I believe, all of which is the in the 4.8 to 4.9 million dollar range.

I do share Mr. Brenner's observation, and I think it's fairly obvious in this market, and I'm not an appraiser but I've certainly dealt with distressed real estate for almost 20 years now, and the market isn't getting better. It's getting worse. And I'm very concerned that I could get anywhere near that number in this current market, your Honor, in the event of closure.

Your Honor, with respect to the pre-receivership deal, I think it's important that the record reflect that it was just that. It was a pre-receivership agreement by Mt. St. Francis, which is the defendant, if you will, in this proceeding, Giordano and ASLC, not the receiver. The receiver is not a party to that pre-petition agreement.

However, at the time Judge Silverstein considered appointment of a receiver, again, there were

representations made regarding the inability of Mt. St. Francis to continue to operate as a viable operating entity without some managerial and operational support. And I can represent to your Honor that when I was appointed, Judge Silverstein directed me to analyze not only that pre-receivership agreement but to negotiate strongly the management agreement with ASLC. And Judge Silverstein and I actually sat down and we reviewed that management agreement together. We modified it and edited it together to ensure that the terms of the management agreement by which ASLC was to be employed were appropriate conditions and appropriate for purposes of use in a receivership proceeding. And the judge, in my opinion, was very concerned that he wanted to ensure that this was, in fact, an arm's length transaction, that it was in the best interest of not just the creditors but all parties in interest that this transaction proceed in that manner. And I believe the court was satisfied that it was; the management agreement was ultimately approved in open court, and I can tell your Honor that I'm aware of no fact or no condition where this is a so-called insider deal.

To the contrary, the reason why I believe ASLC required and Giordano consented to having the matter in a public, open court proceeding is to avoid that

appearance and to ensure translucency, if you will, to the process.

Your Honor, I can represent that I've dealt with ASLC throughout this process, and quite candidly, were it not for it and its managerial team, this operation would have shut down months ago.

Unquestionably, in my opinion, although there's an obligation of ASLC to continue to operate and in effect wind down, if they pull out, because there is a distinction between their position as an offeror here and as management, they have certain responsibilities. I believe those management responsibilities don't require it to continue to fund as opposed to receivership lender.

So with respect to other alternatives that might be available, the fact is, in this situation, there just isn't any other viable opportunity because you will have a closure. There will not be sufficient time to go out and market and advertise and get to another buyer. There just won't be. There won't be cash. ASLC is not going to continue to fund. And is it a difficult position? I think someone raised the point, I think Mr. Brown raised the point that look at the position that Giordano is putting this Court in.

My dad used to say it's not paranoia if it's

true. I don't think that was anyone's intention at the time this agreement was entered into. At the time the agreement was entered into, it was considered as an opportunity to get all creditors paid in full and to pay the IRS a certain amount of money. Unfortunately, it didn't work out that way. And I don't think there was any malice; I don't think it was done with any forethought. It was just one of those things where the assumptions that were the basis of the agreement just, unfortunately, didn't come true.

So with respect to value, your Honor, I am very confident that if this sale does not go forward, we will have a closure, we will have a situation where the value obtained will be substantially less than what will be obtained in this situation, and the cost of liquidation will be significant because, again, we are avoiding the cost of closure and relocation and liquidation and auction expenses and things of that nature by having a going-concern sale.

So when you say $5 million, I understand your Honor was using that as an example, I believe the number is going to be much, much less than that. I believe we'd be lucky to net somewhere in the 2 to 3 million dollar range at the end of the day.

Again, that's just based upon my experience

having been appointed on many, many cases over the years and dealing with collateral issues since my days as a lawyer at Hinckley Allen.

So I just -- that's my position on it. I hope I was clear and didn't babble too much, but I just think it's important that your Honor knows the receiver's position.

THE COURT: Just a couple other minor questions. I notice you mentioned that you and Judge Silverstein sat down to work out this management agreement. And not being experienced in receiverships, is it appropriate for me to meet individually with the receiver to talk about these things?

MR. FERRUCCI: Yes, your Honor. From my perspective, I think it's fairly well-established that the receiver is really the arm of the Court. And so it is typical that the Court will consult with the receiver on issues involved in these types of matters. Unless there's a specific objection by a party, which, again, the Court usually reserves right to be heard on and then rule on whether or not that objection will be sustained or overruled, Judge Silverstein's practice has been to converse with the receiver because, in effect, I am the court's instrument by which the sale or liquidation takes place.

THE COURT: So I may want to do that in this case on this matter. And what I thought I mentioned in a chambers conference, I may not have been explicit, but one thing I am looking for is a draft of an order that would attempt to accomplish the things that you've advocated for here and that we've been talking about, while at the same time not inadvertently doing the things that I think the IRS fears might happen and that I would like to see not inadvertently occur.

In other words, in looking at the form of an order, I want to ensure that I'm not inadvertently priming a claim by Giordano over other secured creditors or over the IRS. In my view, that's not the intention of this proceeding. And so I want whatever I do, if I were to approve this claim or however I were to characterize it, I want to ensure that I'm not inadvertently doing that.

So what I would like to ask you to do is to prepare -- the parties have already submitted joint findings of fact and conclusions of law, both those that can be agreed to and separate where they can't be agreed. And I'm going to use those as well as your briefs and this argument, but I would like you to try to craft an order that accomplishes all of these objections. And I'd like you to do that by meeting

either individually or as a group with all of the parties here and hearing out their ideas on the assumption that the claim were granted for the purposes that we've been talking about, how that can be accomplished without any of these collateral effects.

MR. FERRUCCI: Yes, your Honor.

THE COURT: So could you take that task up and try to create the document, and then when you have it completed, I would like to sit down and meet with you about it.

MR. FERRUCCI: I'd be happy to do that, your Honor.

THE COURT: Okay. What's a reasonable timetable for you to come up with that?

MR. FERRUCCI: By weekend, your Honor, if that's sufficient? By Friday?

THE COURT: That's fine. I'll try to set something up for maybe late next week.

MR. FERRUCCI: That would be great.

THE COURT: Maybe a week from today in the later afternoon would be good, like three o'clock. I think that's open.

Yes. So like at three o'clock we can tentatively put that down. If you have a problem getting things done by then, let me know.

MR. FERRUCCI: I will. Thank you, your Honor.

THE COURT: Okay. Thank you very much.

(Court concluded at 12:00 p.m.)

# C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Anne M. Clayton

______________________________________

Anne M. Clayton, RPR

JUNE 5, 2008

________________________________________

Date