UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ANTONIO L. GIORDANO, | : | |
| | : | |
| Plaintiff, | : | CA. No. 08-0048-S |
| | : | |
| v. | : | |
| | : | |
| MT. ST. FRANCIS ASSOCIATES, L.P., | : | |
| | : | |
| Defendant. | : | (Formerly Rhode Island Superior Court |
| | : | P.M. No. P.B. 06-3301) |

**MIDLAND LOAN SERVICES, INC.'S RESPONSE TO THE RECEIVER'S PETITION TO SELL REAL ESTATE AND BUSINESS ASSETS, INCLUDING MIDLAND'S MOTION TO DETERMINE THAT STAY DOES NOT BAR ASSIGNMENT AND/OR FOR RELIEF FROM STAY**

Midland Loan Services, Inc. ("Midland") hereby responds as follows to the Receiver's Petition to Sell Real Estate and Business Assets (the "Petition"). First and foremost, Midland respectfully requests that the Petition not be considered unless and until (A) this Court addresses Midland's motion herein to (1) determine that the stay at issue in this receivership (the "Stay") does not bar assignment (the "Assignment") of the first and second mortgages (the "Mortgages") to the U.S. Department of Housing and Urban Development ("HUD"), and/or (2) to grant relief from the Stay and allow and authorize Midland to make the Assignment, and (B) HUD, after completion of the Assignment, is given a full opportunity to be heard on the merits of the Petition.

In the alternative, only if this Court does not grant the relief requested above, and subject to further development by HUD, Midland generally makes the following observations and substantive objections concerning the Receiver's Petition: (1) objecting to the requirement that

Midland execute and deliver to the Receiver a lien release, mortgage discharge or the like (Petition, ¶ 7 and last paragraph); (2) objecting to the request for a declaration that the Mortgages be declared to be released and discharged upon consummation of the sale (Petition, ¶ 8 and last paragraph, and Sale Agreement, ¶ 3); (3) objecting to the request that the liens be transferred to the proceeds of the sale (Petition, last paragraph); (4) objecting to the assumption of the Mortgages by any Buyer or its nominee without adequate assurance of future performance by the Buyer of the payment and other obligations under the assumed Notes and Mortgages (Sale Agreement, ¶ 1); (5) objecting to the provision regarding invalidity or subordination of the Notes (Sale Agreement, ¶ 5(i)); (6) objecting to the condition that "all outstanding interest owed on unpaid mortgage payments due at the time of the closing are to be waived and forgiven" (Sale Agreement, ¶ 5(iii)); (7) objecting to the payment of sale proceeds to any party unless and until the Notes and Mortgages are paid in full (e.g., Sale Agreement, ¶¶ 5(iii) and (iv)); (8) objecting to the lack of clarity concerning payment of American Senior Living Corporation's ("ASLC") management fees (Sale Agreement, ¶ 5(v)); and (9) objecting to the Break-Up Fee (Sale Agreement, ¶ 13).

In support hereof, Midland submits the accompanying memorandum of law.

MIDLAND LOAN SERVICES, INC.

By its Attorneys,

/s/ Mark W. Freel
Mark W. Freel (#4003)
Erika C. Lazar (#7558)
EDWARDS ANGELL PALMER
& DODGE, LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (Fax)
mfreel@eapdlaw.com
efarrell@eapdlaw.com

Of Counsel:

Paul M. Hoffmann
Stinson Morrison Hecker LLP
1201 Walnut, Suite 2900
Kansas City, MO 64106-2150
Telephone 816-691-2746
Fax 816-412-1191
phoffmann@stinson.com

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ANTONIO L. GIORDANO, | : | |
| | : | |
| Plaintiff, | : | CA. No. 08-0048-S |
| | : | |
| vi. | : | |
| | : | |
| MT. ST. FRANCIS ASSOCIATES, L.P., | : | |
| | : | |
| Defendant. | : | (Formerly Rhode Island Superior Court |
| | : | P.M. No. P.B. 06-3301) |

**MEMORANDUM OF LAW IN SUPPORT OF MIDLAND LOAN SERVICE'S RESPONSE TO THE RECEIVER'S PETITION TO SELL REAL ESTATE AND BUSINESS ASSETS, INCLUDING MIDLAND'S MOTION TO DETERMINE THAT STAY DOES NOT BAR ASSIGNMENT AND/OR FOR RELIEF FROM STAY**

**Introduction**

Midland Loan Services, Inc. ("Midland") submits this memorandum in support of its response to the Receiver's Petition to Sell Real Estate and Business Assets (the "Petition"), including its Motion seeking an Order of this Court (1) determining that an assignment (the "Assignment") of the first and second mortgages (the "Mortgages") on the subject property at 4 St. Joseph Street, Woonsocket, Rhode Island (the "Property") to the U.S. Department of Housing and Urban Development ("HUD") does not violate the stay (the "Stay") currently in place in this receivership, and/or (2) granting relief from the Stay and allowing and authorizing Midland to make the Assignment.

Midland submits that there are no substantive reasons for preventing the Assignment. First, the ability to collect the insurance (which includes assigning the Notes and Mortgages) is exactly what the Debtor bargained for when it accepted the benefit of HUD financing. Second, the proposed sale is already expressly conditioned on HUD approval, regardless of the

Assignment. Third, the Notes and Mortgages previously were assigned from a prior lender to Midland during this receivership, without objection from the Receiver or application of the Stay. Fourth, substituting HUD for Midland is only a change of parties, not a change in terms or positions. Whatever position HUD chooses to take after an Assignment can and should be addressed by the Court on the merits at that time. Last, but certainly not least, application of the Stay to the proposed Assignment has potentially devastating, nationwide implications for HUD-insured loans across the country.

In the alternative, only if this Court does not grant the relief requested above, and subject to further explanation by HUD, the potential assignee, Midland makes the following observations and substantive objections concerning the Receiver's Petition: (1) objecting to the requirement that Midland execute and deliver to the Receiver a lien release, mortgage discharge or the like (Petition, ¶ 7 and last paragraph); (2) objecting to the request for a declaration that the Mortgages be declared to be released and discharged upon consummation of the sale (Petition, ¶ 8 and last paragraph, and Sale Agreement, ¶ 3); (3) objecting to the request that the liens be transferred to the proceeds of the sale (Petition, last paragraph); (4) objecting to the assumption of the Mortgages by any Buyer or its nominee without adequate assurance of future performance by the Buyer of the payment and other obligations under the assumed Notes and Mortgages (Sale Agreement, ¶ 1); (5) objecting to the provision regarding invalidity or subordination of the Notes (Sale Agreement, ¶ 5(i)); (6) objecting to the condition that "all outstanding interest owed on unpaid mortgage payments due at the time of the closing are to be waived and forgiven" (Sale Agreement, ¶ 5(iii)); (7) objecting to the payment of sale proceeds to any party unless and until the Notes and Mortgages are paid in full (e.g., Sale Agreement, ¶¶ 5(iii) and (iv)); (8) objecting to the lack of clarity concerning payment of American Senior Living Corporation's ("ASLC")

management fees (Sale Agreement, ¶ 5(v)); and (9) objecting to the Break-Up Fee (Sale Agreement, ¶ 13).

## Factual Background

### A. Background on HUD Mortgage Insurance

The National Housing Act was initially passed during the Great Depression in order to stabilize the housing market in the United States and to provide affordable, safe and sanitary housing. Programs administered by HUD under the National Housing Act include provisions relating to multifamily housing, including nursing home facilities. Multifamily housing programs administered by HUD include mortgage insurance programs that facilitate financing for the purchase, construction and rehabilitation of multifamily projects, including nursing home facilities. Mortgage insurance provided by the National Housing Act enables lenders to provide mortgage loans to purchasers and developers of multifamily housing projects on terms more favorable than would otherwise be available on the open market because the endorsement of the promissory note by the Federal Housing Commissioner provides insurance against a default by the borrower, which mitigates the risk of loss for lenders.

Lenders rely upon HUD insurance when making HUD-insured loans on the terms set forth in the applicable loan documents. Purchasers of participation interests in HUD-insured loans rely upon HUD insurance in purchasing the beneficial interests in those loans. The Government National Mortgage Association ("GNMA") requires that all securities pools that it guarantees be backed by a mortgage loan insured by HUD. But for the insurance provided by HUD, lenders and participants would not make or purchase many such loans on the same terms.

In order to obtain the endorsement of the Federal Housing Commissioner on a promissory note for insurance under the National Housing Act, lenders must underwrite and originate the loan in accordance with the rules and regulations of HUD. In order to maintain the

insurance provided by HUD, lenders must service the loans in accordance with the rules and regulations of HUD, including provisions that apply to defaults and delinquencies. If a lender (or a servicer, like Midland) fails to comply with the rules and regulations of HUD, the amount of the lender's mortgage insurance benefits may be curtailed. If a lender loses the benefits of the HUD mortgage insurance, a lender could thereby breach the terms of a participation or servicing agreement. Also, if GNMA guarantied securities have been issued with respect to the loan, as here, loss of HUD insurance is also a breach of the terms of those agreements.

**B. The HUD Mortgage Insurance in This Case**

On or about July 13, 1995, Suburban Mortgage Associates, Inc. ("Suburban") made a loan in the principal amount of $8,622,900.00 (the "Loan") to Mt. Saint Francis Associates, L.P. ("Debtor" or “Mt. St. Francis”) for the purpose of constructing a nursing home facility (the “Facility”) on the Property. The Loan is evidenced by a Mortgage Note (the “Note”) in the original principal amount of $8,622,900.00 dated July 13, 1995, executed by Debtor in favor of Suburban. On or about July 14, 1995, the Note was initially endorsed for insurance pursuant to Section 232 of the National Housing Act by the Federal Housing Commissioner. On or about July 10, 1996, the Federal Housing Commissioner provided its final endorsement on the Note, insuring the Note in a final principal amount of $8,616,500.00. The Note is secured by a Mortgage Deed (the “Mortgage”) dated July 13, 1995, executed by Debtor in favor of Suburban and recorded in the Land Evidence Records of the City of Woonsocket, Rhode Island in Book 0999 at Page 067, encumbering the Property, as more specifically described therein. Around this time, one hundred percent (100%) of the beneficial ownership interest in the Loan was sold pursuant to a Participation Agreement to a participant (“Participant”) whose investment portfolio is now managed by White Mountains Advisors, LLC.

On or about June 22, 1999, Suburban made a second loan (the "Supplemental Loan") in the principal amount of $1,103,600.00. The Supplemental Loan is evidenced by a Supplemental Mortgage Note (the “Supplemental Note”) dated June 22, 1999, in the original principal amount of $1,103,600.00, executed by Debtor in favor of Suburban. On or about June 23, 1999, the Supplemental Note was endorsed for insurance by the Federal Housing Commissioner. The Supplemental Note is secured by a Supplemental Mortgage Deed (the “Supplemental Mortgage”) executed by Debtor in favor of Suburban dated June 22, 1999, recorded in the Land Evidence Records of the City of Woonsocket, Rhode Island in Book 1103 at Page 279. The Supplemental Note and Supplemental Mortgage thereafter became the subject of certain mortgage backed securities (the “GNMA Securities”), the payment of which were guaranteed by GNMA. In connection with the issuance of the GNMA Securities, Suburban entered into certain agreements with GNMA and pledged its interest in the Supplemental Note to GNMA as security for its obligations to GNMA.

At all relevant times set forth above, both the Debtor and Suburban were under the control of Mr. Antonio Giordano (“Giordano”).

**C. <u>Giordano’s Conviction and the Assignment to Midland Loan Services</u>**

Sometime during the first half of 2006, Giordano and ASLC negotiated for the potential purchase of the Debtor’s assets by ASLC. (<u>See</u> Brief in Support of United States Objection to Motion to Prove Administrative Claim (the “Administrative Claim Objection”) filed on March 12, 2008, at ¶ 1.) At the same time Giordano was negotiating with ASLC, the United States filed an Information and Plea Agreement in this Court on June 8, 2006. The Information and Plea Agreement charged Giordano with violations of 12 U.S.C. § 1715z-19. It alleged that Giordano, as the manager and person in control of three nursing homes, including the Debtor, had diverted

$780,539.00 of HUD funds meant for the reasonable and necessary expenses of the nursing homes for his own personal use at a time when the mortgage notes were in default and the nursing homes were in a non-surplus cash position. The Plea Agreement detailed that Giordano agreed to plead guilty to the charges and to make restitution to the nursing homes, including $382,700.00 in restitution to the IRS toward payment of employment taxes that Mt. St. Francis owed. (Administrative Claim Objection, ¶ 2.)

On June 19, 2006, Giordano and the Debtor entered into an agreement pursuant to which ASLC agreed to a potential acquisition of the Debtor's assets (the "Nursing Home Agreement"). The agreement provided that: (1) the Debtor would file a petition asking for the Property to be placed into receivership; (2) ASLC would manage the Property; and (3) ASLC could, at its election, offer to purchase the Property upon the condition, among others, that ASLC assume the above notes and mortgages granted by the Debtor to Suburban. (Administrative Claim Objection, ¶ 2.) On June 21, 2006, Giordano filed a petition in the Rhode Island Superior Court seeking the appointment of a Receiver to take over the assets and operations of the Debtor pursuant to the Nursing Home Agreement. (Administrative Claim Objection, ¶ 3.)

On June 29, 2006, Giordano pleaded guilty and on September 15, 2006, the Court sentenced Giordano to a term of imprisonment of thirty (30) months, a term of supervised release of two (2) years, a fine of $100,000.00, and restitution in the amount of $780,539.00. Giordano paid his restitution in full and on November 6, 2006, the United States filed a Notice of Satisfaction of Judgment. (Administrative Claim Objection, ¶ 6.)

On or about October 22, 2007, Suburban assigned all of its right, title and interest in the Note to Midland pursuant to an Assignment of Mortgage Deed recorded in the Land Evidence Records of the City of Woonsocket, Rhode Island as Instrument No. 00136527 in Book 702,

Page 68. Pursuant to the foregoing Assignment, Midland became the servicer and record owner of the Note and Mortgage, subject to the rights of the Participant under the Participation Agreement. The Receiver did not object to this assignment. Notice of the assignment of the Note and Mortgage was given to HUD pursuant to a Mortgage Record Change executed by Suburban and Midland dated May 24, 2007. Pursuant to the Participation Agreement, referenced above, Midland obtained legal title to the Note and record title to the Mortgage to service the Loan, but the beneficial ownership interest in the Note remained with the Participant.

All right, title and interest of Suburban in the Supplemental Note and Supplemental Mortgage were assigned to Midland pursuant to an Assignment of Supplemental Mortgage Deed recorded on September 12, 2007, in the Land Evidence Records of the City of Woonsocket, Rhode Island in Book 1691 at Page 282, as corrected by Corrective Assignment of Supplemental Mortgage Deed dated October 22, 2007 and recorded in the Land Evidence Records of the City of Woonsocket, Rhode Island as Instrument No. 00136529 in Book 1702 at Page 75. Pursuant to the foregoing Assignment, Midland became the record owner of the Supplemental Note and Supplemental Mortgage, subject to the rights of GNMA and the holders of the GNMA Securities. The Receiver did not object to this assignment. Midland also became the "issuer" of the GNMA Securities and, as required by the rules of GNMA, Midland entered into certain agreements with GNMA and assigned the Supplemental Note and Supplemental Mortgage to GNMA as security for its obligations to GNMA pursuant to an Assignment of Supplemental Mortgage Deed dated November 6, 2007. Notice of the assignment of the Supplemental Note and Supplemental Mortgage was given to HUD pursuant to a Mortgage Record Change executed by Suburban and Midland dated May 24, 2007. The Receiver did not object to this assignment.

Midland relied upon the HUD insurance on the Note and the Supplemental Note in accepting the assignments from Suburban, in becoming obligated to the Participant under the Participation Agreement and in becoming the "issuer" with respect to the GNMA Securities. The Participant relied on the HUD insurance on the Note in purchasing a beneficial interest in the Note pursuant to the Participation Agreement. GNMA relied upon the HUD insurance on the Supplemental Note in providing its guaranty of the GNMA Securities. The Debtor would not have been able to obtain financing for the Project on the terms set forth in the Note, the Mortgage, the Supplemental Note and the Supplemental Mortgage without the insurance provided by HUD under the National Housing Act.

## D. The Default in the Notes and Mortgages

From the commencement of this Receivership through December 2007, all principal and interest payments on the Mortgages were made by ASLC. However, on or about January 17, 2008, the Receiver, at the request of ASLC, sought and obtained an Order of the Superior Court suspending all principal and interest payments on the Mortgages. This was the first time since the Receivership began that a payment default remained outstanding for more than 30 days.

## E. Tender of Assignment to HUD

In order to maintain HUD insurance on the Note and Supplemental Note, Midland must service the Loan and Supplemental Loan in accordance with the rules and regulations of HUD, including those provisions that apply to defaults and delinquencies on the part of the Debtor. Failure by Midland to comply with the rules and regulations of HUD may result in the curtailment of the amount of its mortgage insurance benefits.

HUD policies and procedures require that lenders notify HUD if a borrower fails to make its monthly payment of principal and interest on or before the fifteenth day of the month in

which such payment is due. If the borrower fails to make the monthly payment of principal and interest within thirty days following the date the payment is due, HUD regulations provide that the lender must report the default to HUD. The prescribed HUD notice form must be filed with HUD within sixty days after the loan first becomes in default (or within thirty days after the date the loan has been in default for thirty days). At any time after the loan has been in default for thirty days, the lender has the option to assign the loan to HUD in exchange for mortgage insurance benefits. After the loan has been in default for 75 days (or within such further time as agreed to by HUD), the Lender must commence the assignment process or else suffer the following consequences: (1) curtailment of interest on the claim; or (2) basing the claim on a subsequent default, thereby delaying the default date for purposes of calculating the claim. Importantly, while HUD may extend this deadline, it is not obligated to agree to any extension. See 24 CFR §207.258, 207.259(b)(iii).

Pursuant to the above HUD policies and procedures, Midland fully reported the defaults to HUD and, after 75 days, elected to assign the Mortgages to HUD in order to protect and preserve its interests and interests of the Participant. All of this was done with full disclosure to the Receiver and ASLC, even as various unfulfilled indications were made by ASLC that it would make payments to prevent the necessity of any assignment.

HUD accepted the elections to assign on May 13, 2008, and specified that the Assignment be completed by June 12, 2008. Following standard procedure for loans in the process of being assigned to HUD, Midland liquidated the GNMA certificate holder in the amount of $1,068,206.68 and is now the owner/holder of the Supplemental Mortgage. Midland is unable to reverse the liquidation with GNMA. Thus, Midland has a material and direct economic interest that is being damaged daily by any delay in completing the Assignment.

Failure to properly complete the Assignment could result in a loss of the mortgage insurance and would subject the lender or Participant to the full risk of loss for nonpayment of the loan. Accordingly, based on comments made by this Court at the status conference before this Court on May 29, 2008, and given the June 12th deadline to complete the assignment noted above, Midland and HUD and the Receiver entered into and filed a Joint Stipulation on June 12, 2008 under which, among other things, the parties agreed to withdraw the assignment and otherwise "toll" any otherwise applicable deadlines pending further order of this Court. This Court approved and entered that Stipulation.

**F. The Need to Complete the Assignment to HUD**

Assignment of the Notes and Mortgages is the sole remedy available to Midland and related parties in order to preserve the HUD insurance. Pending completion of the proposed Assignment, Midland and related parties are being materially damaged on a daily basis. The Participant has not received any principal or interest payment since January 2008. The trust holding the Supplemental Note also has not received any principal or interest payments since January 2008. Midland has had to advance interest payments on the Supplemental Note every month since January 2008 pursuant to its servicing agreement. Additionally, Midland now has paid off the trust holding the Supplemental Note pending completion of the Assignment. In addition, Midland is incurring attorneys' fees and expenses in this matter pending its resolution.

If Midland loses the benefit of HUD insurance, it and other parties would suffer material economic damage. In this regard, Midland notes that the Petition contains assertions by the Receiver and counsel for the Buyer that the terms of the Sale Agreement greatly exceed the appraised value of the Property. While not admitting or denying these statements, Midland notes that if and to the extent these statements are correct, then the HUD insurance is critical to

ensuring that the Notes are paid in full. Loss of the HUD insurance could cause the recovery on the Notes and Mortgages to be reduced by approximately fifty percent (50%) or more.

Approving the proposed sale in accordance with the Receiver's Petition does nothing to resolve these issues. At a minimum, the closing is not expected to occcur for several more months, thus causing continuing loss of interest and other charges to Midland and the Participant, all of which are not covered by the proposed assumption. (Sale Agreement, ¶ 5(iii.) Even if the Sale Agreement is closed, the Buyer's "assumption" of the Notes and Mortgages merely transfers the risk of nonpayment to the Buyer with no proof that the Buyer can or will be able to make timely payments.

Moreover, this has potential broad implications beyond the limited context of this Receivership. HUD insurance is used to finance nursing home, intermediate care, assisted living, and related projects across the country. In 2006, HUD issued insurance totaling $1.3 billion for 222 projects with 24,945 beds/units. (See http://www.hud.gov/offices/hsg/mfh/progdesc/nursingalcp232.cfm.) Imposing the Stay against collection of that insurance could destroy the market for HUD-insured loans. This would further destabilize, if not destroy, any ability to complete these kinds of projects.

**G. The Effect of Completing the Assignment to HUD**

Assignment of a mortgage loan from a HUD-approved lender to HUD merely substitutes HUD for Midland as the holder of the Notes and Mortgages. It does not alter the terms of the underlying mortgage loans or otherwise affect the duties and obligations of the borrower. Permitting the assignment of the Note, the Mortgage, the Supplemental Note and the Supplemental Mortgage to HUD will not impair the rights or increase the duties of the Debtor.

## Discussion

This Court has determined that Rhode Island receivership law, not Federal bankruptcy law, is the governing law in a state court receivership removed to Federal court. United States v. F.D.I.C., 899 F. Supp. 50, 54 (D.R.I. 1995). However, this Court also noted in F.D.I.C. that because Rhode Island has no statute governing the priority of claims in receivership proceedings, "Rhode Island courts deciding issues in the area frequently look to federal bankruptcy law for guidance." Id. Accordingly, where there is no applicable Rhode Island authority, as is the case here, there is direct support for the proposition that this Court should look to Federal bankruptcy law for guidance.

The "automatic stay" under Section 362 of the U.S. Bankruptcy Code is at least as broad as, if not broader than, the stay orders entered in these proceedings.[1] The Order Appointing Permanent Receiver, and the related Receivership Notice, entered by the Superior Court on July 12, 2006, state, in relevant part, "[t]hat the commencement, prosecution or continuance of the prosecution, of any action, suit, arbitration, proceeding, hearing, or any foreclosure, reclamation or repossession proceeding … against said Defendant or any of its property … are hereby restrained and enjoined until further order of this Court."

Midland is not aware of any Rhode Island receivership cases regarding the scope of the stay in receivership proceedings. However, Federal bankruptcy law clearly holds that assignment of a mortgage is not a violation of the automatic stay in bankruptcy cases. See Chase Manhattan Mortgage Corp. v. Cordero, 361 B.R. 257, 262 (S.D. Fla. 2007) (holding that lender did not

[1] The filing of a case under the Bankruptcy Code invokes the "automatic stay" of 11 U.S.C. § 362 which "operates as a stay, applicable to all entities, of (1) the commencement or continuation … of a judicial, administrative or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case … (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate, … [and] (6) any act to collect, assess or recover a claim against the debtor that arose before the commencement of the case …"

violate automatic stay when it communicated debtors' default to the Federal Housing Administration ("FHA") and assigned the loan to the FHA). Specifically, the court held that the lender:

> [D]id not violate the stay by transferring the [] mortgage after the bankruptcy filing. . . did not violate the stay by communicating a default to the FHA . . . and . . . did not violate the stay by collecting from a third-party 'guarantor' of the [] mortgage debt.

Id. at 262. In fact, a "primary rationale for refusing to extend the automatic stay to non-bankrupt third parties is to insure that creditors obtain 'the protection they sought and received when they required a third party to guaranty the debt.'" Id. (citing Credit Alliance Corp. v. Williams, 851 F.2d 119, 121-22 (4th Cir. 1988)). There is nothing in the Stay currently in place in this matter that would dictate a different outcome.

The Bankruptcy Court for the Middle District of Georgia has similarly held that:

> [A]utomatic stay provisions of the Bankruptcy Code do not prohibit a creditor of a debtor from transferring any interest or claim it might have against the debtor's bankruptcy estate to a third party. Such a transfer merely substitutes the party that holds the interest or claim against the debtor's bankruptcy estate, and such transfer does not serve to increase or decrease the interest or decrease the interest or claim the party asserts against the debtor's bankruptcy estate.

Tidwell v. Slocumb, 71 B.R. 903, 909 (Bankr. M.D.Ga. 1987); see also Citicorp Park Assocs. v. Aetna Life Ins. Co., 173 B.R. 823, 824 (Bankr. D.Me. 1994) (creditor's payment of a property tax claim on debtor's property or purchase of the claim and acceptance of an assignment did not constitute violation of automatic stay provision); In re Layton, 220 B.R. 508, 514 (Bankr. N.D.N.Y. 1998) (finding that a lien for school taxes can be transferred without violating an automatic stay). Another Bankruptcy Court has held that enjoining a creditor from proceeding "against the non-debtor third parties would allow them to use the Bankruptcy Court and its power as a shield for postponing their legal obligations, a purpose never intended by the Code or

Congress." Kash & Karry Wholesale, Inc. v. Citizens & S. Nat'l Bank of S.C., 28 B.R. 66, 73 (Bankr. S.C. 1982). Thus, the Court expressly frowned upon an automatic stay being used to avoid or delay obligations to a creditor. Another court has stated: "[t]he purpose of a guaranty is to provide a source of alternative assets to the extent the bankrupt or debtor has none. The creditor thus has a right, unaffected by bankruptcy, to turn to the guarantor for satisfaction of a debt." In re Harvey Cole, 2 B.R. 517, 520 (Bankr. W.D. 1980).

Midland is not aware of any relevant Federal bankruptcy cases to the contrary. Moreover, even if such cases exist, Midland notes that the automatic stay of Section 362 can be modified or terminated "for cause." 11 U.S.C. §362(d)(1). Cause would include the prejudice to Midland, and the lack of prejudice to the Receiver, from allowing the Assignment to proceed. Determining that the receivership Stay prevents the Assignment, or should not be modified to permit the Assignment, runs contrary to bankruptcy law and could have a chilling impact across the country on lenders relying on HUD insurance to secure loans, especially in the current economic climate.

Furthermore, the proposed sale of the real estate and business assets of the Debtor is expressly conditioned upon HUD's approval of:

> (1) a Transfer of Physical Assets to Buyer in connection with the sale of Assets (including the Nursing Home Facility); (2) the so-called 223(a)(7) refinance application of Buyer with respect to Assets secured by the Mortgage Loans, or some other refinance application of Buyer with respect to Assets secured by the Mortgage Loans, or some other refinancing option that may be proposed by HUD that is acceptable to Buyer in its discretion; and (3) the assumption of the Mortgage Loans by Buyer.

Paragraph 23, Real Estate Purchase and Sale Agreement. Thus, the Receiver and the Buyer have expressly acknowledged the need for HUD consent to "the assumption of the Mortgage Loans by Buyer" and there is no reason to force Midland and the Participant to incur further damage for

every day the Assignment is delayed.

Finally, as noted above, and if and only if this Court does not grant the relief requested above, and subject to further development by HUD, the potential assignee, Midland has asserted certain observations and/or objections to the Receiver's Petition. Most of these observations and objections are self-explanatory and can be further addressed, as necessary, at oral argument. In sum, Midland: (1) objects to the requirement that Midland execute and deliver to the Receiver a lien release, mortgage discharge or the like (Petition, ¶ 7 and last paragraph); (2) objects to the request for a declaration that the Mortgages be declared to be released and discharged upon consummation of the sale (Petition, ¶ 8 and last paragraph, and Sale Agreement, ¶ 3); (3) objects to the request that the liens be transferred to the proceeds of the sale (Petition, last paragraph); (4) objects to the assumption of the Mortgages by any Buyer or its nominee without adequate assurance of future performance by the Buyer of the payment and other obligations under the assumed Notes and Mortgages (Sale Agreement, ¶ 1); (5) objects to the provision regarding invalidity or subordination of the Notes (Sale Agreement, ¶ 5(i)); (6) objects to the condition that "all outstanding interest owed on unpaid mortgage payments due at the time of the closing are to be waived and forgiven" (Sale Agreement, ¶ 5(iii)); (7) objects to the payment of sale proceeds to any party unless and until the Notes and Mortgages are paid in full (e.g., Sale Agreement, ¶¶ 5(iii) and (iv)); (8) objects to the lack of clarity concerning payment of American Senior Living Corporation's ("ASLC") management fees (Sale Agreement, ¶ 5(v)); and (9) objects to the Break-Up Fee (Sale Agreement, ¶ 13).

## Conclusion

For reasons set forth herein, the proposed Assignment to HUD does not violate the Stay or, at most, should be permitted under the Stay. To avoid irreparable financial harm to Midland and other parties, and with no anticipated adverse impact on the Receivership estate, it is vital that Midland assign the Mortgages to HUD forthwith.

WHEREFORE, Midland requests that this Court determine that the Stay does not bar the Assignment and/or grant relief from the Stay as appropriate. Midland also respectfully requests that this Court note and/or address its substantive concerns and objections to the proposed sale, to be further articulated by HUD, the proposed assignee.

MIDLAND LOAN SERVICES, INC.

By its Attorneys,

/s/ Mark W. Freel

Mark W. Freel (#4003)
Erika C. Lazar (#7558)
EDWARDS ANGELL PALMER & DODGE, LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (Fax)
mfreel@eapdlaw.com
efarrell@eapdlaw.com

Of Counsel:

Paul M. Hoffmann
Stinson Morrison Hecker LLP
1201 Walnut, Suite 2900
Kansas City, MO 64106-2150
Telephone 816-691-2746
Fax 816-412-1191
phoffmann@stinson.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of June, 2008, a true copy of the foregoing document was served upon each attorney of record listed below by electronic filing of this document with the United States District Court for the District of Rhode Island:

| | |
|---|---|
| Joseph Avanzato | javanzato@apslaw.com, vlanctot@apslaw.com |
| James E. Brown | James.E.Brown2@usjoj.gov, northern.taxcivil@usdoj.gov |
| Dulce Donovan | dulce.donovan@usdoj.gov, gale.james@usdoj.gov, Kellyann.anderson@usdoj.gov, nancy.a.diquinzio@usdoj.gov, Paulette.gamache@usdoj.gov, usari-ecf@usdoj.gov |
| R. Thomas Dunn | tdunn@lmkbw.com |
| Joseph P. Ferrucci | jferrucci@frlawri.com, cmulhearn@frlawri.com, gabodelly@frlawri.com, jsmith@frlawri.com |
| Douglas A. Giron | dgiron@shslawfirm.com, asalvaggio@shslawfirm.com, dsmith@shslawfirm.com, phalperin@shslawfirm.com, |
| Christopher H. Little | clittle@lmkbw.com, mbranco@lmkbw.com, spomeroy@lmkbw.com |
| Geoffrey W. Millsom | gmillsom@apslaw.com, stheriault@apslaw.com |
| Christopher M. Mulhearn | cmulhearn@frlawri.com, lverria@frlawri.com |
| Ly Nguyen | ly.nguyen@usdoj.gov, Ann.D'Arpino@hud.gov |
| Allan M. Shine | ashine@wszlaw.com, efile@wszlaw.com, egarant@wszlaw.com |

/s/ Mark W. Freel