UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ANTONIO L. GIORDANO, | : | |
| | : | Case No. 1:08-cv-00048-S-LDA |
| Plaintiff | : | Honorable William E. Smith |
| | : | Referral Judge: Honorable Lincoln D. |
| v. | : | Almond |
| | : | |
| MT. ST. FRANCIS ASSOCIATES, L.P., | : | |
| | : | (Formerly Rhode Island Superior Court |
| Defendant | : | P.M. No. P.B. 06-3301) |

----------------------------------------------------------

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| Intervenor-Plaintiff | : |
| | : |
| v. | : |
| | : |
| ANTONIO L. GIORDANO, | : |
| MT. ST. FRANCIS ASSOCIATES, L.P., | : |
| and JOSEPH FERRUCCI, ESQUIRE, as | : |
| Receiver, | : |
| | : |
| Intervenor-Defendants | : |

**MEMORANDUM OF LAW IN SUPPORT OF UNITED STATES' LIMITED OBJECTION TO RECEIVER'S PETITION TO SELL REAL ESTATE AND BUSINESS ASSETS FREE AND CLEAR OF LIENS**

In accordance with Local Rule 7(b), the creditor the United States files this Memorandum of Law in support of its Limited Objection to the Receiver's Petition to Sell Real Estate and Business Assets Free and Clear of Liens, filed in the above-captioned proceeding on June 9, 2008.

## BACKGROUND

During 2006, Defendant Mount St. Francis Associates, L.P. ("MSF"), owned and operated the healthcare facility located at 4 St. Joseph Street, Woonsocket, Rhode Island, commonly known as "Mt. St. Francis Health Center" (the "Facility"). Plaintiff Antonio Giordano ("Giordano"), Defendant MSF, and American Senior Living Corporation ("ASLC") were negotiating a potential purchase of MSF's assets by ASLC. Ultimately, Giordano agreed with ASLC to structure the sale of MSF's assets as a sale through a receivership proceeding.

On June 19, 2006, Giordano and MSF entered into an agreement pursuant to which ASLC agreed to a potential acquisition of MSF's assets (the "Nursing Home Agreement"). The agreement provided that: (1) MSF would file a petition for the operation of the Facility to be placed into receivership; (2) ASLC would manage the MSF Facility; (3) ASLC could, at its election, offer to purchase the Facility upon the conditions that: (a) ASLC pay the Internal Revenue Service ("IRS") on behalf of MSF "an amount that satisfies any and all taxes, fines, and penalties owed by MSF, Mr. Giordano or John Montecalvo, as past due or pursuant to any court order or lien, as of the date hereof" (the "IRS Liabilities"); (b) ASLC assume a note and mortgage granted by MSF to Suburban Mortgage Associates, Inc.; (c) ASLC assume all liabilities of MSF, other than the IRS Liabilities; and (d) ASLC pay certain pre-petition accounts receivable.

On June 21, 2006, Giordano filed a petition in the Rhode Island Superior Court seeking the appointment of a receiver to take over the assets and operations of MSF. The Superior Court appointed Joseph Ferrucci, Esquire, as Receiver, and ASLC has been managing the Facility ever since. On September 30, 2006, the Internal Revenue Service ("IRS") filed proof of a secured

claim in the amount of $6,658,415.97, as of the petition date, with respect to unpaid employment taxes of MSF for which notices of federal tax lien had been filed pre-petition.

On January 28, 2008, ASLC and the Receiver agreed, subject to court approval, for ASLC to purchase the assets of MSF without paying the IRS Liabilities (the “First Sale Agreement”). The First Sale Agreement provided, among other terms, that (a) ASLC shall assume notes and mortgages granted by MSF to Suburban Mortgage Associates, Inc., now assigned to Midland Loan Services, Inc., in the total amount of approximately $9,300,000.00 (the “Mortgage Notes”), (b) ASLC shall forgive and convert to equity purported claims against the receivership for priority administrative operating loans in excess of $600,000, (c) at closing, ASLC shall pay to the receivership estate $900,000 (the “Closing Payment”), and (d) at closing, ASLC shall pay the unpaid fees of the Receiver.

The First Sale Agreement also provided, among other terms, that ASLC’s obligation to make the Closing Payment and to close was conditioned upon receiving a release from Giordano in favor of ASLC of “any claims purportedly arising out of” the Nursing Home Agreement, and upon a court order confirming that the purchase of the assets “shall likewise be free and clear of any and all claims including those under the Agreement.” On or about Jaunaury 28, 2008, the Receiver filed a petition in Superior Court to approve the First Sale Agreement, and Giordano filed a motion to prove an administrative claim, arguing that he should be allowed an administrative claim in the amount of $900,000, conveniently equal to the Closing Price, in exchange for granting ASLC and the Receiver a release of any liability under the Nursing Home Agreement.

In response to the Receiver's original petition and Giordano's motion, the IRS requested the United States to intervene in these proceedings to defend its federal tax liens. On February 11, 2008, the Superior Court permitted the United States to intervene, and on February 13, 2008, the United States removed the receivership to this Court. On March 12, 2008, this Court entered an order appointing Joseph P. Ferrucci as the Receiver of MSF.

During subsequent negotiations, the IRS indicated that it would be willing to discharge its federal tax liens to allow a sale under the First Sale Agreement to go forward, provided that the $900,000 Closing Payment were placed in escrow, without prejudice to the rights of all interested parties to assert their rights to receive all or part of the Closing Payment. In particular, the United States insisted on an opportunity to contest both whether Giordano held an administrative claim in the first place, and if he did, its priority relative to the United States' tax liens. Giordano indicated that he would only grant a release of his purported claims, which would have allowed the sale to proceed, if his motion to prove administrative claim were granted, subject to litigation only as to the priority of his claim. Consequently, the parties briefed the issue of whether Giordano had an administrative claim, and a hearing on Giordano's motion was held on March 26, 2008.

Before the Court had ruled on Giordano's motion to prove an administrative claim, ASLC determined that it would no longer insist on receiving a release of Giordano's purported claims under the Nursing Home Agreement as a condition to buying MSF's assets. ASLC submitted a revised offer to purchase the assets, and on June 9, 2008, ASLC and the Receiver entered into a new Real Estate Purchase and Sale Agreement (the "Second Sale Agreement"),

again subject to Court approval. The Second Sale Agreement is not conditioned on ASLC receiving any release from Giordano.

The Second Sale Agreement appears to substantially reduce the purchase price for MSF's assets, in at least the following ways. First, whereas under the First Sale Agreement ASLC agreed to forgive approximately $638,269.49 in purported administrative operating loans, "plus additional projected priority administrative operating loans from the date of this Agreement through Closing," under the Second Sale Agreement, ASLC would only forgive the roughly $638,269.49, "plus interest accrued to the date of the Closing." *See* First and Second Sale Agreements, §§ 5(ii). Thus, ASLC is now declining to forgive a portion of the operating loans it had previously agreed to forgive (from the date of the First Sale Agreement to the anticipated closing under that agreement), and is refusing to forgive any operating loans during the delay occasioned by Giordano's administrative claim motion.

Second, although under the First Sale Agreement, ASLC had agreed to assume the Mortgage Notes, without specific conditions, the Second Sale Agreement provides that the ostensible cash payment of $900,000 shall be reduced by "all outstanding principal owed relating to any unpaid mortgage payments due at the time of Closing . . . , which unpaid mortgage principal payments shall be assumed by Buyer at the time of the Closing." Second Sale Agreement § 5(iii)(iii). Upon information and belief, ASLC has breached its Management Agreement with the Receiver by failing to make payments on the Mortgage Notes, and it has effectively reduced its proposed sale by the principal amount of those missed payments.

Third, ASLC had agreed to "pay the Court-approved and unpaid fees owed to the Receiver as of the date of the Closing," but ASLC is now agreeing to pay only "the Court-

approved and unpaid fees owed to the Receiver as of the date of the Closing up to the sum of $150,000." First and Second Sale Agreements §§ 5(iv).

In addition to apparently substantially reducing the purchase price for MSF's assets,[1] the Second Sale Agreement provides that certain purported priority claims will be pre-paid, and thereby exempt from approval and administration according to law under the receivership. In particular, the Second Sale Agreement provides that the ostensible cash payment of $900,000 will be reduced (upon payment) by the purported administrative fees and expenses of the Receiver, including ASLC's alleged unpaid management fees (which under the Agreement are required to be approved the Court in advance of the sale), and by any "valid municipal lien amounts, if any, owing to the City of Woonsocket." *See* Second Sale Agreement § 5(iii)(i), (ii), (v).

It is also notable that ASLC's obligations under the Second Sale Agreement are conditioned on there being no advertisements seeking additional bids for the purchase of MSF's assets, "given Buyer's concern that such advertising would substantially devalue the Nursing Home," and on the Court's approval of a $250,000 break up fee potentially payable to ASLC under its Management Agreement with the Receiver. *See* Second Sale Agreement §§ 13; 23, ¶ 3.

On June 9, 2008, the Receiver filed a petition to approve the Second Sale Agreement. The petition prays, *inter alia*, that the Receiver be authorized to sell MSF's assets upon the terms and conditions in the Second Sale Agreement, or under such other terms and conditions as the

[1] The undersigned and, upon information and belief, the IRS, have been provided with no information as to the amounts of additional unpaid operating loans, unpaid principal payments under the Mortgage Notes, and unpaid Receiver's fees, to be taken out of the purchase price.

Court may approve, and that all entities claiming liens or other encumbrances against MSF's assets be directed to execute and deliver discharges or equivalent documents such that the sale of MSF's assets will be free and clear of liens and encumbrances. For the reasons set forth below, the United States objects to aspects of the Receiver's petition.

## ARGUMENT

### A. The Decision Whether to Discharge the United States' Federal Tax Liens Against MSF's Assets is Entirely Within the Discretion of the Internal Revenue Service

ASLC and the Receiver acknowledged and agreed in the First Sale Agreement that the proposed sale was contingent on the Receiver obtaining an agreement from the IRS to discharge its liens on all property and rights to property of MSF from MSF's assets. First Sale Agreement § 3, ¶ 4. Apparently, the parties have now erroneously concluded that while they must full pay Woonsocket's possible municipal liens in order to secure a discharge of those liens, federal tax liens can be discharged or ordered discharged by this Court.

Section 6325(b) of the Internal Revenue Code, 26 United States Code, is the only authority under which a federal tax lien may be discharged from property to which it has attached. That section provides that the Secretary of the Treasury *may*, in his discretion, and only in specified circumstances, discharge federal tax liens from property. With an exception not relevant here, the IRS's determinations under section 6325(b) are entirely within its discretion, and are not subject to judicial review. *See*, *United States v. Williams*, 514 U.S. 527, 537 (1995) (the remedy of a discharge under 26 U.S.C. § 6325(b)(3) "is available only at the Government's discretion."); *E.J. Friedman Company, Inc. v. United States*, 6 F.3d 1355 (9th Cir. 1993) (an IRS decision not to discharge federal tax liens from property cannot be reviewed under

the Administrative Procedures Act, because § 6325 commits such decisions entirely to agency discretion).

Congress has not empowered the Courts to discharge federal tax liens or to order the IRS to discharge federal tax liens. As explained by the Eighth Circuit, in reversing a district court's order purporting to discharge liens from property for equitable reasons:

> In this case it is the statute that creates the tax lien and prescribes its duration and after the notice has been duly given the power of the court to determine the rights of the parties in respect to the lien is limited by the statute. There was no statutory authority conferred on the court to discharge or terminate the lien without satisfaction of the tax or exhaustion of the property and its equity power was "limited by special statutory provisions."
>
> We do not find in any of the cases cited for appellees a holding that the court may discharge a valid tax lien imposed by the statute merely because it appears to the court that the existence of the lien bears harshly on those who have dealt with the taxpayer in disregard of the lien.

*United States v. Stutsman Implement Company, Inc.*, 274 F.2d 733, 736 (8th Cir. 1960) (quoting from *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321 (1906)). *See also, United States v. Heasley*, 283 F.2d 422, 429 (8th Cir. 1960) (similar); *United States v. Arnold*, 2001 U.S. Dist. LEXIS 13520, at *7 (Midd. Dist. Fla. 2001) ("Intervenor asks this Court to do something which is beyond its authority. Intervnor's Counterclaim essentially asks the Court to force the IRS to discharge its tax liens . . . . [. . .] Whether the IRS discharges its tax liens is purely up to the discretion of the Secretary of the Treasury.") (citations omitted).

## B. The Internal Revenue Service Does Not Consent to Discharge Its Federal Tax Liens Upon the Terms Set Forth in the Second Sale Agreement

The IRS is not willing to discharge its federal tax liens from MSF's assets upon the terms of the Second Sale Agreement, and the United States objects to those terms, for at least three reasons. First, the IRS has no basis on which to evaluate whether the Second Sale Agreement

represents the highest and best offer that could be obtained for MSF's assets. The IRS cannot evaluate whether any reduction in the sale price for the assets between the First and Second Sale Agreements would be appropriate. In addition, although the First Sale Agreement was apparently the product of negotiation between Giordano (MSF's general partner) and ASLC (because Giordano was to receive the $900,000 Closing Payment), Giordano apparently provided no input on (and now disputes) the adequacy of the purchase price under the Second Sale Agreement. The United States notes that the Receiver's assertion that the value of MSF's assets, on a going concern basis, is only $4.9 million (a figure set forth in an appraisal obtained by ASLC), is dubious given ASLC's apparent willingness to pay substantially more. In this regard, the IRS will insist that the sale of MSF's assets be advertised to other potential bidders, perhaps in accordance with the Receiver's usual practice, in such a manner as to provide potential bidders with a meaningful opportunity to make offers to purchase MSF's property.[2]

Second, the IRS objects to the pre-payment of purported priority claims, namely municipal liens of the City of Woonsocket, and administrative fees and expenses of the Receiver (including ASLC's alleged unpaid management fees), without the normally-applicable protections under receivership law against the inappropriate payment of such claims. The procedures provided by law for the administration of claims should be followed in this case. In particular, the IRS does not consent to the pre-payment, ahead of its federal tax liens, of unspecified and unsubstantiated "municipal liens" and Receiver's fees and expenses, based only on the information provided in the Second Sale Agreement.

---

[2] As explained in Argument Section C, below, regardless of the IRS's position, 28 U.S.C. § 2001 mandates that specified steps be taken to test the fairness of the sale price.

Third, the IRS objects to the break-up fee provision in section 13 of the agreement attached to the Receiver's petition to sell.

**C. Under 28 U.S.C. § 2001, Three Disinterested Appraisals and a Newspaper Advertisement Are Required Before Any Sale Occurs**

In addition to the IRS's insistence that a process be implemented to adequately check the fairness of the Second Sale Agreement, Section 2001 of Title 28, United States Code, requires that certain procedures be followed in any district court-approved private sale of real property. As recently explained by a district court:

> Generally, "[t]he district court has broad powers and wide discretion to determine relief in an equity receivership." *S.E.C. v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992). This includes the power to permit a Receiver to sell property where appropriate to protect the receivership estate. Id.; see also Doc. Nos. 10, 78. Sale of real property held by a receiver is permitted by 28 U.S.C. § 2001.
>
> Under § 2001(a), sales must generally be made by public auction. Alternatively, the court may authorize a private sale if, after a hearing followed by notice to all interested parties, the court finds that the best interests of the estate will be conserved by a private sale. Id. § 2001(b).
>
>> Before confirmation of any private sale, the court shall appoint three disinterested persons to appraise such property . . . . No private sale shall be confirmed at a price less than two-thirds of the appraised value. Before confirmation of any private sale, the terms thereof shall be published in such newspaper or newspapers of general circulation as the court directs at least ten days before confirmation. The private sale shall not be confirmed if a bona fide offer is made, under conditions prescribed by the court, which guarantees at least a 10 per centum increase over the price offered in the private sale.
>
> Id. This section applies to all sales except those in bankruptcy cases, or those involving receivers appointed by the Comptroller of the Currency. Id. § 2001(c).
>
> The Former Fifth Circuit held that these requirements "are, by the express terms of the statute, made conditions precedent to a valid sale." *Acadia Land Co. v. Horuff*, 110 F.2d 354, 354-55 (5th Cir. 1940). A sale made without compliance to these requirements is "void." Id. at 355 & n.1.

*SEC v. Kirkland*, 2007 U.S. Dist. LEXIS 45353, at *5-*6 (Midd. Dist. Fla. 2007) (ellipsis original).

In the *Acadia Land* case, a receiver sold land in a private sale without complying with the provisions of 28 U.S.C. § 2001, but with the approval of the district court and the consent of the bank holding a mortgage on the land. The district court, over the objections of a creditor of the company in receivership, approved the receiver's final account. The creditor appealed, and the former Fifth Circuit reversed and remanded, holding that the failure to comply with section 2001 rendered the sale void. The Court rejected the receiver's argument that the requirements of section 2001 are "merely directory, and not mandatory," as follows:

> The section of the statute authorizing private sales of real estate is of recent enactment. It was designed to cure a defect with reference to the sale of land under court authority in cases where a public sale under existing statutes would result in a sacrifice of the property. Due to the opportunity for frauds in private sales, the Congress limited the power of the courts to confirm such sales to cases where notice, hearing, and appraisal had been afforded as provided in the statute authorizing the same. This purpose could not be effected if non-compliance with any material requirement were permitted, and, for that reason, all of the requirements are, by the express terms of the statute, made conditions precedent to a valid sale.
>
> We are not confronted here even with a substantial compliance with the provisions of the statute, but with a total disregard thereof. Under these circumstances, to hold this sale of real estate valid would have the effect of violating essential provisions of the very statute from which the power to act is derived. This sale was void because the court was lacking in jurisdiction to confirm it. [footnote and citations omitted].

*Acadia Land Co. v. Horuff*, 110 F.2d 354, 354-55 (5th Cir. 1940). *See also, U.S. v. Macia*, 157 F. Supp. 2d 1369 (S. Dist. Fla. 2001) (refusing to approve trustee's contract to sell real estate without complying with 28 U.S.C. § 2001).

Accordingly, any sale of MSF's assets approved by this Court may be confirmed only after the requirements of 28 U.S.C. § 2001 with respect to the real property have been satisfied. In particular, the condition of the Second Sale Agreement that no advertisement of the sale shall occur cannot be approved.

## CONCLUSION

The United States and its agency the Internal Revenue Service recognize that there is a strong public interest in the continuation of the Mt. St. Francis Health Center as a going concern, and the IRS may be willing, upon appropriate terms and after appropriate procedures have been followed, to discharge its federal tax liens from MSF's assets in order to facilitate the sale of the business to ASLC, or to another buyer. The United States does not object to the Receiver's request to sell the Facility in a private, as opposed to a public, sale. At this time, however, the IRS is not willing (and under 26 U.S.C. § 6325 may not be permitted) to discharge its liens according to the terms set forth in the Receiver's petition and the Second Sale Agreement, because they provide no assurance that ASLC's offer is the best that could be obtained, and because the Second Sale Agreement attempts to force the *de facto* pre-payment of purported priority claims. Other potential buyers should be given an opportunity to submit offers to purchase the Facility, and the payment of claims and all other aspects of this receivership should be administered in accordance with law. The United States also notes that, confirming the

appropriateness of the IRS's insistence on a process to check the fairness of ASLC's offer, any court-approved sale of the Facility must follow the procedures required by 28 U.S.C. § 2001.

Respectfully submitted,

ROBERT CLARK CORRENTE
United States Attorney

*<u>/s/ James E. Brown</u>*

JAMES E. BROWN
Trial Attorney
U.S. Department of Justice, Tax Division
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6053
Facsimile: (202) 514-5238
Email: James.E.Brown2@usdoj.gov