UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ANTONIO L. GIORDANO, Plaintiff, v. MT. ST. FRANCIS ASSOCIATES, L.P. Defendant | : | CA. No. 08-0048-S (Formerly Rhode Island Superior Court P.M. No. P.B. 06-3301) |
| UNITED STATES OF AMERICA, Intervenor-Plaintiff v. ANTONIO L. GIORDANO, MT. ST. FRANCIS ASSOCIATES, L.P., and JOSEPH FERUCCI, ESQUIRE, as Receiver, Intervenor-Defendants. | : | |

**SECRETARY OF HOUSING AND URBAN DEVELOPMENT'S MOTION FOR RECONSIDERATION OF THE COURT'S POSITION AS TO APPLICABILITY OF THE STAY TO THE ASSIGNMENT PROCESS OF HUD-INSURED MORTGAGES, OR, IN THE ALTERNATIVE, MOTION FOR RELIEF FROM THE STAY**

COMES NOW, the Secretary of Housing and Urban Development ("HUD"), by his attorneys, and submits this Motion for Reconsideration of the Court's Position as to the Applicability of the Stay to the Assignment Process of HUD-Insured Mortgages, or, in the Alternative, Motion for Relief from the Stay.

Respectfully submitted,

ROBERT CLARK CORRENTE
United States Attorney

/s/ Ly T. Nguyen
LY T. NGUYEN
Assistant United States Attorney
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
401-709-5000
401-709-5017 (fax)
Email: ly.nguyen@usdoj.gov

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ANTONIO L. GIORDANO, | : | |
| | : | |
| Plaintiff, | : | CA. No. 08-0048-S |
| | : | |
| v. | : | |
| | : | (Formerly Rhode Island Superior |
| | : | Court P.M. No. P.B. 06-3301) |
| MT. ST. FRANCIS ASSOCIATES, L.P. | : | |
| | : | |
| Defendant | : | |

--------------------------------------------------

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| Intervenor-Plaintiff | : |
| | : |
| v. | : |
| | : |
| ANTONIO L. GIORDANO, | : |
| MT. ST. FRANCIS ASSOCIATES, L.P., | : |
| and JOSEPH FERUCCI, ESQUIRE, as | : |
| Receiver, | : |
| | : |
| Intervenor-Defendants. | : |

**MEMORANDUM IN SUPPORT OF THE SECRETARY OF HOUSING AND URBAN DEVELOPMENT'S MOTION FOR RECONSIDERATION OF THE COURT'S POSITION AS TO APPLICABILITY OF THE STAY TO THE ASSIGNMENT PROCESS OF HUD-INSURED MORTGAGES, OR IN THE ALTERNATIVE, MOTION FOR RELIEF FROM THE STAY**

The Secretary of Housing and Urban Development ("HUD"), by his attorneys, offers this Memorandum in Support of His Motion for Reconsideration of the Court's Position as to Applicability of the Stay to the Assignment Process of HUD-insured Mortgages, or in the Alternative, Motion for Relief from the Stay. The motion is based on HUD's position that the stay does not apply to the assignment process of the HUD-insured mortgages. Alternatively, if the stay does apply, it should be lifted in this case to allow the assignment of the mortgages to

HUD.

## I. Background

Defendant Mt. St. Francis Associates, L.P. ("Mt. St. Francis"), is a Rhode Island limited partnership whose principal asset is a nursing home, Mt. St. Francis Health Center ("nursing home" or "project"), located in Woonsocket, Rhode Island. Plaintiff Antonio L. Giordano is the general partner of Mt. St. Francis. Defendant financed the acquisition of the nursing home through HUD-insured mortgages under the National Housing Act ("NHA"), 12 U.S.C. 1701, et seq.

### A. HUD's National Insurance Program

Section 232 of the NHA, 12 U.S.C. § 1715w, authorizes HUD to provide mortgage insurance to private lenders who finance such projects. By reducing the economic risk associated with such loans, section 232 enables developers to obtain financing at lower interest rates. Moreover, lenders are given incentives to help finance such projects because HUD, through the contract of insurance, the NHA, and regulations, have contracted to pay lenders in the event of a default by the mortgagor. The regulations make no exception that abates HUD's contractual obligations when the project is in a receivership or bankruptcy. If such an exception was made, lenders would have less incentive to finance such projects because they would not be able to count on HUD during a receivership or bankruptcy, a time when the risk of default is high and when the need for HUD insurance is critical to reducing their financial loss.

#### 1. How the Contract of Insurance is Created

A contract between HUD and an insured lender is created when HUD endorses the mortgage note for a particular project. See 24 C.F.R. §§ 200.100 and 232.570. The endorsement

identifies which section of the NHA and which provisions of HUD's implementing regulations are incorporated by reference into the contract of insurance. Mortgages of nursing home properties, including mortgages obtained for the purpose of construction or substantial rehabilitation of nursing homes, are insured under § 232 of the NHA, 12 U.S.C. § 1715w.[1] Pursuant to the mortgage insurance provisions of the NHA, the Secretary of HUD "is authorized to insure any mortgage . . . upon such terms and conditions as he may prescribe." 12 U.S.C. § 1715w(c). HUD implements § 232 of the NHA through Part 232 of its regulations, see 24 C.F.R. §§ 232.252 and 232.800(a), and through other provisions incorporated by reference into that part. [2]

In addition, an insurance contract between HUD and a lender for the completion of construction or substantial rehabilitation of a nursing home is created when HUD provides its "initial endorsement" on the mortgage note for a particular project. See 24 C.F.R. §§ 200.47(a)(2) and 200.100(a). The initial endorsement allows the lender to make "insured advances" of mortgage funds to the borrower, or on an incremental basis, and in accordance with HUD approval. 24 C.F.R. § 200.47(b). A loan is eligible for "final endorsement" only when all advances of mortgage proceeds have been made and all the terms and conditions of the insurance commitment have been met to the Commissioner's satisfaction. 24 C.F.R. § 200.100(b).

---

[1] Although Section 207 of the NHA governs the insurance of loans secured by multifamily rental housing projects, subsections (d), (e), (g), (h), (i), (j), (k), (l) and (n) of section 207 are made applicable to the insurance of nursing home loans by Section 232(f) of the NHA, 12 U.S.C. § 1715w(f).

[2] Regulations applicable to loans for multifamily housing projects, contained in 24 C.F.R. Part 207, Subpart B, are made applicable to nursing home loans by 24 C.F.R. § 232.251(a). The regulations in 24 C.F.R. Part 200, Subpart A, are made applicable to nursing home loans by 24 C.F.R. § 232.1. The loan servicing provisions of 24 C.F.R. Part 201 are then made applicable by 24 C.F.R. § 202.5(e).

### 2. HUD and Lender's Contractual and Statutory/Regulatory Requirements in the Event of Default

As stated above, for loans insured under the NHA, HUD assumes the risk of borrower default. Any failure of a borrower to make a payment required under the terms of a mortgage constitutes a default. See NHA § 207(g), 12 U.S.C. § 1713(g); 24 C.F.R. § 232.830(a).

Lenders must report all defaults to HUD within 30 days of the 30th day following the initial default, in other words, within 60 days of the initial nonpayment. See 24 C.F.R. § 232.850(a). Section 207(g) of the NHA, 12 U.S.C. § 1713(g), provides that when a default continues for 30 days, the lender "shall be entitled to receive the benefits" of the mortgage insurance, provided that it assigns and delivers to the Secretary, "within a period and in accordance with rules and regulations to be prescribed by the Secretary," certain specified rights, monies and documents. 12 U.S.C. § 1713(g) (emphasis added). The 30-day period of continuing default that triggers lender eligibility for the benefits of the mortgage insurance contract is reiterated in 24 C.F.R. § 232.830(c). Title 24, Code of Federal Regulations, Section 232.830(c) provides, "[i]f such defaults as defined in paragraph (a) and (b) of this section continue for a period of 30 days the lender shall be entitled to receive the benefits of the insurance hereinafter provided." 24 C.F.R. § 232.830(c) (emphasis added).

Moreover, 24 C.F.R. § 232.875 specifies that the election provided by Section 207(g) of the NHA must be made within "45 days after the lender becomes eligible for the benefits of loan insurance, or within such later time as may be agreed upon by the Commissioner in writing." Upon HUD's approval of the lender's election to assign, the lender must record the assignment within 30 days. 24 C.F.R. § 207.258(b); 24 C.F.R. § 232.880(d).

Upon an acceptable assignment of the note, the Commissioner "shall pay" the lender's claim in "an amount equal to the unpaid principal balance of the loan as of the date of default" determined by adding certain items, including "[a]ny accrued interest due as of the date of execution of the assignment of the loan to the Commissioner," "[a]ny advances approved by the Commissioner made previously by the lender under the provisions of the note," and "[a]ny loan insurance premiums paid after default." See 24 C.F.R. § 232.885(b) (emphasis added). If the lender failed to promptly report the default and to make its election within the prescribed 75-day period, it is not entitled to recover any interest that accrued after the date of the default. 24 C.F.R. § 232.885(b)(1)(v).

Section 203(e) of the NHA, 12 U.S.C. § 1709(e), further provides that any "contract of insurance . . . executed by the Secretary . . . shall be conclusive evidence of the eligibility of the loan or mortgage for insurance, and the validity of any contract of insurance executed shall be incontestable . . . except for fraud or misrepresentation" of the lender. This provision, known as the incontestability clause, is at the heart of HUD's insurance programs.

**B. Contract of Insurance between Suburban and HUD**

In this case, Defendant financed acquisition of the nursing home with a loan in the amount of $8,622,900 from Suburban Mortgage Associates, Inc. ("Suburban").[3] (Ex. 1.) Defendant secured this loan with a mortgage on July 13, 1995 that encumbered the project. (Ex. 1. ) HUD insured this loan pursuant to Section 232 of the NHA, 12 U.S.C. § 1715w. Thus,

---

[3] On July 10, 1996, Plaintiff and Defendant entered into a Modification Agreement with Suburban. (Ex. 2.) This modification agreement provided that by reason of cost certifications, the principal amount of the loan was decreased from $8,622,900 to $8,616,900. (Ex. 2.) On July 10, 1996, Defendant and Suburban executed an Allonge to the July 13, 1995 note, amending the principal amount of the note to $8,616,900 and substituting a new payment schedule. (Ex. 3.)

HUD guaranteed payment to Suburban in the event Defendant defaulted on its loan obligation.

Defendant subsequently obtained an operating loss loan in the amount of $1,103,600 from Suburban.[4] (Ex. 4.) The Defendant secured this loan with a supplemental mortgage on June 22, 1999. (Ex. 4.) HUD insured the operating loss loan under Section 232 pursuant to Section 223(d) of the NHA, 12 U.S.C. §§ 1715w, 1715n(d), which also guaranteed payment by HUD to Suburban in the event of a default.

**C. State Court Receivership Case**

Due to the "precarious financial condition of [Mt. St. Francis]" and near the time that Plaintiff signed a plea agreement for equity skimming, United States v. Giordano, 1:06CR72 (D. R.I.), Plaintiff filed a petition in the Rhode Island Superior Court for the appointment of a receiver for Mt. St. Francis on June 21, 2006. (Ex. 6.) In the Petition to Appoint a Receiver, Mt. St. Francis assets were defined as the following: (1) the physical assets used in connection with the Facility; (2) accounts receivables; (3) cash; and (4) potential claims. (Ex. 6 at ¶ 3.)

Pursuant to the Plaintiff's petition, the Superior Court appointed Joseph Ferrucci as receiver and entered an Order Appointing Permanent Receiver on July 12, 2006. (Ex. 7.) Paragraph 3 of the order states:

> That said Receiver be and hereby is authorized, empowered and directed to take possession and charge of said estate, assets, effects, property and business of the Defendant, including cash surrender value of any insurance owned by Defendant, and to preserve the same, and is hereby vested with title to the same; to collect and receive the debts, property and other assets and effects of said Defendant, including such cash surrender value, with full power to prosecute, defend, adjust and compromise all claims and suits of, by or against said Defendant .

[4] On June 22, 1999, Plaintiff and Defendant entered into a Second Modification Agreement with Suburban. (Ex. 5.) The second modification agreement provided that the original note and mortgage were amended to provide that a default under the supplemental note and mortgage shall be a default under the original note and mortgage.

(Ex. 7 at ¶ 3.)

Paragraph 13 of the order further provides:

> That the commencement, prosecution, or continuance of the prosecution, of any action, suit, arbitration proceeding, hearing, or any foreclosure, reclamation or repossession proceeding, both judicial and non-judicial, or any other proceeding, in law, or in equity or under any statute, or otherwise, against said Defendant or any of its property, in any Court, agency, tribunal, or elsewhere, or before any arbitrator, or otherwise by any creditor, stockholder, corporation, partnership or any other person, or the levy of any attachment, execution or other process upon or against any property of said Defendant, or the taking or attempting to take into possession any property in the possession of the Defendant or of which the Defendant has the right to possession, or the cancellation at any time during the Receivership proceeding herein of any insurance policy, lease or other contract with Defendant, by any of such parties as aforesaid, other than the Receiver designated as aforesaid, or the termination of telephone, electric, gas or other utility service to Defendant, by any public utility, without obtaining prior approval thereof from this Honorable Court, in which connection said Receiver shall be entitled to prior notice and an opportunity to be heard, are hereby restrained and enjoined until further order of this Court.

(Ex. 7 at ¶ 13.) Thus, the order precludes any action against the Mt. St. Francis property. Notably, nothing in the order prevents a creditor from assigning its rights to a third-party or requiring a third-party, such as HUD, from performing its contractual obligations under the NHA.

Around the time of the Receiver's appointment, the Receiver engaged ASLC Management of RI, I, LLC ("ASLC") to manage the nursing home.[5] (Ex. 8.) The Management Services Agreement dated June 21, 2006, specifically required ASLC "to undertake, pay, perform, and discharge all its obligations as set forth in Section 2 of that certain Mt. St. Francis Agreement by and among Mt. St. Francis Associates, L.P., Antonio L. Giordano and Manager dated June 19, 2006." (Ex. 8 at § 3.19.) Section 2 of the Mt. St. Francis Agreement dated June

[5] The receiver and ALSC have subsequently entered into extension agreements, the last agreement extending ALSC's term to September 30, 2008. (See Text Order Granting Motion to Enter into Extension Agreement dated June 10, 2008.)

19, 2006, provides that ASLC shall "pay all mortgage and institutional financing charges related to the Facility and keep such payments current or as otherwise agreed to by HUD or the mortgagee of the Facility." (Ex. 9 at § 2(b)(iv)).

On August 6, 2007, Suburban executed an Assignment of Supplemental Mortgage Deed, whereby it assigned the June 22, 1999 supplemental mortgage to Midland Loan Services, Inc. ("Midland").[6] (Ex. 10.) On October 22, 2007, Suburban executed an assignment of mortgage, whereby it assigned the July 13, 1995 mortgage to Midland. (Ex. 11.) On the same date, Suburban executed a Corrective Assignment of Supplemental Mortgage Deed. (Ex. 12.) Neither the Receiver, nor any other party, objected to the assignment.

Thereafter, on January 17, 2008, the Superior Court, as part of its order granting the receiver permission to enter into a third extension agreement[7], allowed ASLC to miss monthly mortgage payments from January 11, 2008 until the closing date of the real estate or 45 days from January 11, 2008[8], whichever shall first occur. (Ex. 14.) The Superior Court order, however, did not relieve Midland or HUD of its obligations under the NHA, its regulations, and the contract of insurance. Upon learning of this order, HUD raised its concerns with ASLC and the Receiver, and later with the Court, with respect to the "lack of notice to HUD regarding bringing this issue to the Court's attention and the potential triggering of HUD's assignment

[6] Subsequently, a corrective assignment of supplemental mortgage was executed on October 22, 2007 to delete a reference to June 23, 1999 second modification agreement.

[7] Nothing in the Receiver's motion to enter into a third extension agreement provided notice that the Receiver or ASLC was also requesting relief from making mortgage payments for a period of time. (Ex. 13.) Moreover, upon information and belief, Midland, the largest secured creditor of Defendant, was not provided notice of the motion or hearing on the motion to enter into a third extension agreement. (See Ex. 13 at 4, "Certificate of Service.")

[8] HUD asks that the Court take judicial notice that 45 days from January 11, 2008 is February 25, 2008.

process and HUD's note sale process by the lender declaring a default if ASLC does not make timely payments in accordance with the terms of the mortgage." (Ex. 15 at 1 n. 1.)

On January 28, 2008, the Receiver filed a petition to sell the real estate and business assets free and clear of liens, whereby ASLC was to purchase the nursing home and assume the HUD-insured notes secured by mortgages and pay the sum of $900,000 to the receivership estate. Simultaneously, Giordano filed a motion to prove his claim, whereby he asserted an administrative claim of $900,000.

**D. Removal of State Court Receivership to Federal Court**

On February 13, 2008, the United States removed the receivership case to this Court. On March 12, 2008, this Court entered an order approving the appointment of Joseph Ferrucci as receiver ("Stay Order") and confirming all previous orders of the Rhode Island Superior Court. The Stay Order "ratified and confirmed" the prior state court order appointing Ferrucci as the permanent receiver. Accordingly, the state court's prior stay of any action against the property of the estate was still in effect.

As a result of the Defendant's failure to make the January and February mortgage payments due under the terms of the mortgage note, Midland initially reported the default and subsequently submitted to HUD its elections to assign both the first mortgage and the operating loss loan on February 26, 2008. (Ex. 16.)

Subsequent to the submission of the elections to assign, Midland reported to HUD the receipt of one monthly payment from ASLC for both the mortgage loan and the operating loss loan on March 7, 2008. Midland acknowledged the March 7th payment to be the January payment and asserted that the March 7th payments had no impact on the current default status of

the loans.

During a conference call on March 13, 2008, the Receiver and ASLC requested Midland, along with a representative of its investor on the Mt. St. Francis loans, White Mountain Advisors ("White Mountain"), to withdraw its submissions of the elections to assign pending the outcome of a hearing scheduled for March 26, 2008 on Plaintiff's Motion for Approval of Administrative Claim. The Receiver did not indicate during that call his position that Midland's elections to assign violated the stay. On March 26, 2008, this Court held the hearing on Giordano's Motion for Approval of Administrative Claim. At the hearing, Suburban's counsel advised the Court that Midland had elected to assign the mortgages back to HUD. (Ex. 22, March 26, 2008, Tr. 53:4-7.) None of the parties, nor this Court, at that time, raised any concern that Midland had violated the stay by electing to assign the mortgages to HUD.

In April and May 2008, ASLC failed to make any mortgage payments due under the terms of the mortgage as confirmed by Midland. On May 2, 2008, with the mortgages in default, Midland advised HUD to proceed with processing of its election to assign, and HUD subsequently confirmed with White Mountain that White Mountain was in agreement with Midland. (Ex. 17.) HUD then issued to Midland its notices of approval of Midland's elections to assign the first mortgage note and the operating loss loan on May 13, 2008. (Ex. 18.) In accordance with the instructions in these notices and pursuant to 24 C.F.R. § 207.258(b), Midland was required to record the assignments on or before June 12, 2008 or obtain an extension from HUD. On May 14, 2008, during a call in which the Receiver updated the undersigned that ASLC was now no longer requiring a release from Plaintiff as a condition of the sale, the undersigned advised the Receiver of HUD's approval of the elections to assign and

the Receiver made no suggestion that the approval of the elections to assign assignment was improper.

On May 15, 2008, the Receiver sent the following e-mail message to HUD and others:

> By this notice I am reminding all parties that there exists a court imposed stay which forms a portion of the federal court order. That stay provision is extraordinarily encompassing and is designed such that any act that negatively impacts agreements to which the debtor is a party or otherwise affecting the assets of the debtor are generally prohibited. The case law is well established that prudence requires court authority before any act is taken which arguably impacts an asset or right of the debtor. Accordingly, I reserve all rights as receiver to treat as a knowing violation of the court imposed injunction any action relative to the HUD backed notes included without limitation any action by the holder or HUD resulting in acceleration of the secured indebtedness. Please govern yourselves accordingly.

(Ex. 19.)

On May 19, 2008, counsel for HUD replied to the Receiver by e-mail as follows: "As you are probably aware, assignment of a mortgage is not a violation of the automatic stay. See Chase Manhattan Mortgage Corp. v. Cordero, 361 B.R. 257 (S.D. Fla. 200 [sic]) (holding that lender did not violate automatic stay when it reported default and assigned loan to FHA). (Ex. 20.) On the same day, the Receiver responded: "You were simply put on notice of the court imposed stay. You can advise your client in any way you wish. You should note well that we are not in a federal bankruptcy proceeding and therefore any reliance thereon in a federal receivership process may be misplaced. The case law is abundant in this regard." (Ex. 20.)

Shortly thereafter, the Receiver met with this Court ex parte. After the Receiver's meeting with the Court, the Receiver provided notice to the parties that the Court was scheduling a status conference for May 29, 2008. On May 29, 2008, this Court, during a status conference held in chambers, advised that bankruptcy case law does not control and that the assignment of the mortgages violated the stay. The Court indicated that Midland and/or HUD would be subject

to sanctions if they did not stop the assignment process. The Court directed Midland to withdraw its elections to assign and HUD to withdraw its approval of the elections to assign. The Court advised that the proper recourse was for Midland or HUD to file a motion for relief from the stay in order to continue with the assignment process. As a result of this Court's May 29 statements, including the possibility of sanctions, HUD and Midland filed a Joint Stipulation on June 12, 2008 by which Midland withdrew its election to assign and HUD withdrew its acceptance of that election. The Court entered the Joint Stipulation on June 16, 2008.

As of the date of the filing of this motion, HUD has confirmed with Midland that the last mortgage payment made was on March 7, 2008. Thus, no mortgage payments were made in April, May, and June 2008. Accordingly, pursuant to 12 U.S.C. § 1713(g), and 24 C.F.R. § 232.830(a), Defendant's failure to make mortgage payments due under the terms of the note constitutes a default under the NHA.

## II. Argument

### A. Applicable Law

In United States v. Kimball Foods, Inc., 440 U.S. 715, 726 (1979), the Supreme Court noted that, "[t]his Court has consistently held that federal law governs questions involving the rights of the United States arising under nationwide federal programs." As the Supreme Court explained in Clearfield Trust Co. v. United States, 318 U.S. 363, 366-67 (1984):

> When the United States disburses its funds or pays its debt, it is exercising a constitutional function or power . . . . The authority [to do so] had its origin in the Constitution and the statutes of the United States and was in no way dependent on the laws [of any State]. The duties imposed upon the United States and the rights acquired by it . . . find their roots in the same federal resources. In absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards.

Guided by the principles in Clearfield Trust Co., the Supreme Court held that when federal agencies lend funds by the authority of federal legislation, their rights as lenders also derive from and warrant the protection of federal law. Kimbell, 440 U.S. at 726-27; see also Caudill v. Blue Cross & Blue Shield of N.C., 999 F.2d 74, 78-79 (4th Cir. 1993) ("[F]ederal common law governs the duties and obligations of the federal government under contracts to which it is a party."); United States v. Sylacauga Properties, Inc., 323 F.2d 487, 491 (5th Cir. 1963) ("The force and meaning of the receivership clause in FHA mortgages are matters to be decided according to federal law, with especial attention to the scope and purpose of the National Housing Act itself."); Independence Hill, Ltd. v. Puller Mortgage Assocs., 33 F.3d 1378 (5th Cir. 1994) ("Federal law rather than state law governs any claim concerning HUD's enforcement of a security interest."); United States v. Helz, 314 F.2d 301, 303 (6th Cir. 1963) ("In cases affecting government money and the credit of the government, the authorities set up the principle that federal law should apply. This principle is true in cases arising under the National Housing Act."); United States v. Victory Highway Vill., Inc., 662 F.2d 488, 497 (8th Cir. 1981) (federal law governs "the rights and liabilities of the parties [regarding] remedies available upon default of a federally held or insured loan," and a state statutory right of redemption "limiting the effectiveness of the remedies available to the United States" cannot be adopted); United States v. Schlesinger, 88 F.Supp.2d 431, 440 (D. Md. 2000) ("Since, undeniably, the parties' rights and obligations under the [Regulatory Agreement] involves pervasive federal interests, federal common law governs the [Regulatory Agreement's] interpretation."); In re Walker, 163 B.R. 488 (Bankr. N.D. Tex. 1994) (recognizing "compelling public policy interests behind housing acts" and directing trustee to comply with HUD

procedure).

Although courts have incorporated state law as the federal rule where there is little need for a nationally uniform body of law and where state law would not frustrate specific objectives of federal programs, See Kimbell, 440 U.S. at 727-729, this is not the case here. "[T]he application of federal law to the rights and remedies of the United States upon default of federally held or insured loans is warranted by the " 'overriding federal interest in protecting the funds of the United States and in securing federal investments.' " U.S. v. Landmark Park & Assocs., 795 F.2d 683, 686 (8th Cir. 1986).

Notwithstanding the overriding federal interest at stake here, even if this Court were to look to state law on this issue, the issue of whether the assignment of a mortgage to a federal agency during a receivership violates the stay has not been addressed statutorily in Rhode Island as far as undersigned counsel is aware. Where an issue in Rhode Island receivership law has not been addressed statutorily, this Court and Rhode Island state courts have looked to the Bankruptcy Code and to the decisions of the Bankruptcy Courts for guidance. See, e.g., United States v. F.D.I.C., 899 F.Supp. 50, 54 (D.R.I. 1995) (Lagueux, C.J.) (looking to federal bankruptcy law for where Rhode Island did not have statute setting forth priority of claims in receivership proceedings); Reynolds v. E & C Assocs., 693 A.2d 278, 281 (R.I. 1997) ("this court looks to the Bankruptcy Act and to decisions by the federal courts for guidance in determining the priority of claims including those of secured claimants"); R.I. Hosp. Trust Nat'l Bank v. Nat'l Health Found., 384 A.2d 301, 304 (1978) (citing both bankruptcy and receivership cases regarding question of reasonableness of sale price of equipment sold in receivership proceeding); Leonard Levin Co. v. Star Jewelry Co, Inc., 175 A. 651, 652 (R.I. 1934) ("In the

absence of a statute prescribing the order in which debts of an insolvent shall be ranked, a court of equity should be guided generally by the statutory rules applicable to the payment of debts in insolvency and bankruptcy."); see also Rutkin Elec. Supply Co., Inc. v. Burdette Electric, Inc., 237 A.2d 500, 503 (N.J. Super. 1967) ("Since our insolvency statute is essentially a bankruptcy act, we may look to the bankruptcy rules for guidance."); St. John Med. Ctr. v. Wash. Dep't of Social and Health Servs., 38 P.3d 383, 388 (Wash. Ct. App. 2002) (looking to federal bankruptcy law for guidance in insurance insolvency proceeding). Accordingly, given the federal interest at stake here and the absence of state law on this issue, this Court should look to federal bankruptcy law for guidance on whether the stay applies to the assignment of the mortgages and notes to HUD.

**B. The Stay in This Receivership Proceeding Does Not Apply to the Assignment of the Mortgages and Notes to HUD**

The Stay Order serves as an automatic stay entered against all parties taking action against Mt. St. Francis property. See Dulgarian v. Sherman, C.A. No. 91-3468, 1992 WL 813512, at *1 (R.I. Super. January 7, 1992) ("Pursuant to the appointing a permanent receiver, an automatic stay entered against all parties taking action against [receivership] property.") (attached as Ex. 21). This stay is similar to the automatic stay in bankruptcy which stays actions to control or possess property of the estate. See 11 U.S.C. § 362(a)(3). In this case, the Stay Order does not apply to Midland's right to assign the Mt. St. Francis mortgages to HUD or HUD's right to accept assignment because Midland and/or HUD did not attempt to take action against Mt. St. Francis' property.

**1. The Mortgages and Notes Are Not Assets of the Receivership Estate.**

Notably, in Paragraph 3 of the petition that gave rise to this receivership, Plaintiff states

that the Mt. St. Francis "assets are the following: (1) the physical assets used in connection with the Facility; (2) accounts receivables; (3) cash; and (4) potential claims." (Ex. 6, ¶ 3.) The notes and mortgages held by Midland are clearly not included in this description of the Defendant's assets. The notes and mortgages are not physical assets (i.e., the real and personal property used in connection with operation of the nursing home), are not accounts receivable (i.e., money owed to the Defendant), and are not cash. Likewise the notes and mortgages held by Midland are not "potential claims" because for a potential claim to be an asset of Defendant it would have to be a potential claim by Defendant. The notes and mortgages give Defendant no potential claim. To the contrary, the notes and mortgages constituted an obligation or debt of Defendant and the estate. Moreover, the fact that the notes and mortgages were previously assigned by Suburban to Midland in 2007, without objection by any party or the Receiver, supports HUD's position that the notes and mortgages are not assets of the estate. (See Exs. 10-12.)

**2. The Assignment of the Mortgages and Notes to HUD Do Not Accelerate the Promissory Notes.**

At least two months after the Receiver became aware that Midland had elected to assign the mortgages to HUD, the Receiver expressed concern that Midland's elections to assign the mortgages to HUD violated the stay. The focus of that concern was not the assignment itself but rather the effect of acceleration of the promissory notes, which would render the entire unpaid principal due and owing. (See Ex. 19: "I reserve all rights as receiver to treat as a knowing violation of the court imposed injunction any action relative to the HUD backed notes included without limitation any action by the holder or HUD resulting in acceleration of the secured indebtedness."). The assignment process, however, does not require Midland or HUD to accelerate the Mt. St. Francis promissory notes. Moreover, the Receiver cannot show that the

assignment results in acceleration of the notes. Even if HUD ultimately sold the notes and mortgages in a so-called "note sale[9]," the sale of the notes itself would not automatically result in acceleration. In the case of a pending receivership, the new note holder who sought to accelerate the notes would have to address the Receiver's concern that the acceleration violates the stay. Thus, any concern that Midland or HUD would accelerate the notes is unwarranted and should thus not serve as the basis for applying the stay to the assignment process.

### 3. The Assignment of the Mortgages and Notes Involve a Contractual Relationship Between HUD and Midland to which the Receiver, Standing in the Shoes of Defendant, Has No Right to Interfere.

The assignment occurs in the context of a contractual relationship between HUD and Midland, to which the Receiver, standing in the shoes of Defendant, has no right to interfere. As noted by the court in DeRoo v. U.S., 12 Cl. Ct. 356, 361-62 (Cl. Ct. 1987), "[t]he HUD insurance program does not impose a duty upon HUD to others, except to insure a lender's mortgage if it complies with [the NHA]." See also United States v. Lawrence Towers, Inc., 236 F.Supp. 208, 211 (E.D.N.Y. 1964) ("Not only does the [NHA] and the regulations fail to create any legal relationship based upon contract or tort between Government and the mechanics' lien

---

[9] Subpart B of Part 290 of Title 24 of the Code of Federal Regulations governs the sale of HUD-held multifamily mortgages, including nursing home mortgages. "HUD will sell HUD-held multifamily mortgages on a competitive basis." 24 C.F.R. § 290.30(a). In addition, "HUD retains full discretion to offer any qualifying mortgage for sale and to withhold or withdraw any offered mortgage from sale." Id. HUD's policy allows for the sale of current mortgages with or without FHA mortgage insurance and of delinquent mortgages without FHA mortgage insurance. See 24 C.F.R. § 290.35. HUD's authority to dispose of HUD-held mortgages in a note sale is under Section 204 of the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1997 as amended ("Section 204 of the Appropriations Act"), codified in 12 U.S.C. § 1715z-11a ("the Flexible Authority provision"), which allows the Secretary to determine terms and conditions of its management and disposition of mortgages held by the Secretary, "notwithstanding any other provision of law." 12 U.S.C. 1715z-11a(a) (emphasis added).

holders, but it does not create any such relationship even between the Government and the mortgagor.").

In fact, "the general rule of law is that appointment of a receiver does not determine any rights nor destroy any liens. The receiver merely becomes an assignee of the insolvent, having exactly the same rights that he had." Maxl Sales Co. v. Critiques, Inc. , 796 F.2d 1293, 1297 n. 2 (10th Cir. 1986); see also 65 Am. Jur. 2d Receivers § 111 (2008) ("Because a receiver stands in the shoes of the entity whose property is in receivership, a receiver- has or takes, or may assert, no greater rights in the property subject to the receivership than the entity whose property is in receivership . . . .") Because Mt. St. Francis did not have any right to interfere with Midland and HUD's contractual relationship pre-receivership, it follows that the Receiver, stepping into the shoes of Mt. St. Francis, also does not have the right to interfere with Midland's and HUD's contractual relationship.

In United States v. 1300 Lafayette East, 455 F.Supp. 988, 991 (E.D. Mich. 1978), the mortgagor defendant counterclaimed against the United States for wrongful assignment that occurred after the mortgagor was in default of the HUD-insured loans. The court in Lafayette East held that the assignment of the mortgages and notes to HUD was proper and that the mortgagor had no standing to attack the assignment. Id. The court explained:

> None of the hypothecations given by defendant to evidence this loan transaction contain any covenant that protects the mortgagee from assigning the same to a third party. The loan documents repeatedly contemplate a possible assignment of the hypothecations to HUD. An assignment by the mortgagee to any third party would not alter any obligations of the mortgagor under the mortgages and notes. The claimed impropriety of the acceleration would not be affected by an assignment nor would any of defendant's rights be compromised by an assignment by the insured mortgagee to its insurer, HUD.

Id. at 991-92 (emphasis added).

### 4. Bankruptcy Court Cases Lend Further Support that the Assignment of the Mortgage and Notes Do Not Violate the Stay.

Cases involving the automatic stay of the Bankruptcy Code provide useful guidance in this receivership, since the stay imposed by the Code is functionally analogous to the effect of the stay imposed by the Stay Order in this case. The Code provides that the filing of bankruptcy operates as a stay, applicable to all entities, of--

> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
>
> (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;
>
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
>
> (4) any act to create, perfect, or enforce any lien against property of the estate;
>
> (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;
>
> (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;
>
> (7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and
>
> (8) the commencement or continuation of a proceeding before the United States Tax Court concerning a corporate debtor's tax liability for a taxable period the bankruptcy court may determine or concerning the tax liability of a debtor who is an individual for a taxable period ending before the date of the order for relief under this title.

11 U.S.C. § 362(a).

Like the Stay Order in this receivership, the Bankruptcy Code stay prohibits actions

against the debtor and the debtor's property. In a recent decision by a federal district court, Chase Manhattan Mortg. Corp. v. Cordero, 361 B.R. 257 (S.D. Fla. 2007), the court held that the assignment of a mortgage to HUD following the mortgagor's default did not violate the bankruptcy stay. In that case, the Cordero court vacated sanctions imposed by the bankruptcy court against Chase Manhattan Mortgage Corp. ("Chase") for assigning a mortgage to HUD that it held on the debtor's property. Id. at 258-59. In Cordero, the debtors argued that Chase violated the automatic stay by taking control or possession of the property estate by interfering with the debtors' "contractual property right" to their approved FHA-insured mortgage refinancing.[10] The court rejected this argument stating that even "assuming that the debtors' had a right to the refinancing, the record is devoid of allegations that Chase sought possession of or exercise control over the new loan agreement." Id. at 262.

The Cordero court further explained that, "[a]nytime a creditor, such as Chase, seeks repayment from a third party surety or guarantor, such as FHA, the third party is less likely to guarantee the debtor's future debts. But the fact that the debtor can no longer obtain a guaranty from that third party, is no fault of the collecting creditor, and cannot be held a sanctionable interference with the debtor's property." Id. at 262. The court also emphasized that, "a primary rationale for refusing to extend the automatic stay to nonbankrupt third parties is to insure that creditors obtain the 'protection they sought and received when they required a third party to guaranty the debt.' " Id. (quoting Credit Alliance Corp. v. Williams, 851 F.2d 119, 121-22 (4th Cir. 1988)). The court thus found that "Chase did not violate the stay by communicating a

[10] The Receiver and/or ASLC cannot argue that there is any approved FHA-insured mortgage refinancing here because the Receiver and/or ASLC has not submitted any application for FHA-insured mortgage financing, let alone received any approval from HUD with respect to such financing.

default to the FHA, where the purpose of the communication was simply to obtain repayment from a third-party guarantor . . . . [a]nd Chase did not violate the stay by collecting from a third-party 'guarantor' of the Corderos' mortgage debt." Id. at 262; see also In re Smith, 14 B.R. 956, 957-58 (Bankr. D. Conn. 1981) (student loan creditor did not violate automatic stay by putting guarantor on notice of default and requesting payment from guarantor in accordance with their loan guarantee agreement).

In dicta, however, the Cordero court recognized that, "[i]f the Corderos had alleged a property interest in the mortgage insurance policy, there could have been a basis for upholding the bankruptcy court's decision granting sanctions for Chase's alleged violation of the automatic stay. " Id. at 261. The Cordero court then cited to In re Minoco Group of Companies, Ltd., 799 F.2d 517, 518 (9th Cir. 1986), which held that the cancellation of the insurance policy between debtor and the insurance company that insured debtor against indemnity claims made by its officers and directors constituted "property of the estate." Cordero, 361 B.R. at 261. Unlike Minoco, the insurance contract here is between Midland and HUD, not Mt. St. Francis. Further, HUD insures Midland from a default by Mt. St. Francis. Thus, the party holding a property interest in the mortgage insurance is Midland, not Mt. St. Francis.

Moreover, in In re Halabi, 184 F.3d 1335 (11th Cir. 1999), the court held that the assignment of the perfected mortgage from Republic to Farragut, from Farragut to Atlantic, and finally from Atlantic to Federal- did not involve the transfer of any property belonging to the debtor or to the debtor's estate. Id. at 1337. The court stated that, "the assignment was merely the transfer of one mortgagee's interest to a successor mortgagee." Id. The court noted that 11 U.S.C. § 541 provides support that the perfected mortgage is neither actually nor potentially the

property of the debtor because this section provides that property in which the debtor holds only legal title and not equitable title (such as a mortgage) becomes property of the estate only to the extent of the debtor's interest. Id.; see also 11 U.S.C. § 541(d) ("Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property . . . becomes property of the estate . . . only to the extent of debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."); 11 U.S.C. § 541 note (Legislative Statements) ("Thus, as section 541(a)(1) clearly states, the estate is comprised of all legal or equitable interests of the debtor in property as of the commencement of the case. To the extent such an interest is limited in the hands of the debtor, it is equally limited in the hands of the estate except to the extent that defenses which are personal against the debtor are not effective against the estate."); In re Dwyer, 250 B.R. 472, 474 (Bankr. R.I. 2000) ("when the debtor holds only bare legal title and not equitable title to property, only the legal title becomes part of the debtor's bankruptcy estate"); In re Cook, 457 F.3d 561 (6th Cir. 2006) (holding that mortgagee did not violate automatic stay when it attempted to perfect its interest in mortgage after the filing of bankruptcy petition because mortgagee did not attempt to transfer legal title to debtors' property, but recorded only bank's equitable interest in the property, which does not belong to debtors); In re Torrez, 63 B.R. 751, 753 (B.A.P. 9th Cir. 1986) ("where the debtor possesses only a legal and not equitable interest in property, the equitable interest does not become part of the estate"). Likewise, assignments of mortgages and mortgage notes are not in violation of the stay in receivership cases, because such assignments do not involve transfer of the mortgagor's interest in real property or a transfer of property of the mortgagor's estate.

Indeed, in In re Smith, 14 B.R. 956, 957 (Bankr. Conn. 1981) debtor claimed that the lender and the guarantor of the student loan violated the stay when the lender requested the guarantor to pay the note upon default by the debtor and when the guarantor subsequently paid the lender. The Smith court rejected this argument stating that the lender "was merely asserting a claim against the [guarantor] pursuant to their contractual arrangement." Id. at 957. Thus, the Smith court held that the lender and the guarantor did not violate the automatic stay. Id. at 958; see also Lynch v. Johns-Manville Sales Corp., 710 F.2d 1194, 1196 (6th Cir. 1983 ("It is universally acknowledged that an automatic stay of proceeding accorded by § 362 may not be invoked by entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to Chapter 11 debtor." ); In re Larmar Estates, Inc., 5 B.R. 328, 330 (Bankr. N.Y. 1980) ("The automatic stay provisions of section 362(a) do not protect the guarantors of a loan that was made to the debtors."). Thus, these bankruptcy cases provide ample guidance for this Court to conclude that the assignment does not apply to the HUD-insured mortgages.

**5. Extending the Stay to the Assignment of the Mortgages and Notes Would Implicate the Compelling Federal Interests of the Government to Honor Its Contractual Obligations and to Encourage Lenders to Finance the Development of Nursing Homes.**

If the Court were to hold that the stay order applies to the assignment of the mortgages and notes, the compelling federal interests of the government to honor its contractual obligations and to encourage lenders to finance the development of nursing homes would be implicated. Notably, Congress enacted section 232 of the NHA, 12 U.S.C. § 1715w, to encourage the development of nursing homes, intermediate care facilities, and assisted living facilities for the elderly by authorizing HUD to provide mortgage insurance to private lenders who finance such projects. As a result, lenders nationwide have incentive to finance such projects because the

economic risk associated with such loans are reduced through mortgage insurance, and lenders are assured by the NHA that HUD will honor its contractual duties to insure the loans in the event of a default. See Penobscott Indian Nation v. HUD, 539 F.Supp.2d 40, 44 (D.D.C. 2008) ("FHA insures mortgages, meaning that it agrees to protect mortgage lenders against the risk of loss caused by borrower's non-payment as authorized by the National Housing Act, 12 U.S.C. § 1701 et seq.")

In this case, when Midland took over the assignment of the HUD-insured mortgages from Suburban, Midland reasonably relied on the fact that HUD would protect it against loss if the mortgagor defaulted. In fact, Section 207(g) of the NHA, 12 U.S.C. § 1713(g), provides that when a default continues for 30 days, the lender "shall be entitled to receive the benefits" of the mortgage insurance, provided that it assigns and delivers to the Secretary, "within a period and in accordance with rules and regulations to be prescribed by the Secretary," certain specified rights, monies and documents. 12 U.S.C. § 1713(g) (emphasis added). Title 24, Code of Federal Regulations, Section 232.830(c) also provides that, "[i]f such defaults as defined in paragraph (a) and (b) of this section continue for a period of 30 days the lender shall be entitled to receive the benefits of the insurance hereinafter provided." 24 C.F.R. § 232.830(c) (emphasis added).

As courts have recognized, " '[t]he federal policy to protect the treasury and to promote the security of federal investment which in turn promotes the prime purpose of the [NHA] to facilitate the building of homes by the use of federal credit becomes predominant'" once default is established. United States v. Victory Highway Vill., Inc., 662 F.2d 488, 494 (8th Cir. 1981) (quoting United States v. Stadium Apts., Inc., 425 F.2d 358, 363 (9th Cir. 1970)). Thus, denying Midland this protection now that the mortgagor is in default undermines the entire FHA

insurance program by injecting uncertainty and risk into the financial market that relies on HUD to perform as promised in the contract of insurance.

**6. Extending the Stay to the Assignment of the Mortgages and Notes Would Be Contrary to the NHA, its Regulations, and HUD's Contract of Insurance with Midland.**

Extending the stay to the assignment of the mortgages and notes would be contrary to the NHA, its regulations, and HUD's contract of insurance with Midland. In fact, to reassure lenders that in most circumstances the Secretary cannot, if default occurs, simply deny the validity of the contract for insurance, Congress amended the National Housing Act in 1939 to incorporate what is known in private insurance law as an "incontestability clause":

> Any contract of insurance herefore or hereafter executed by the Secretary under this subchapter shall be conclusive evidence of the eligibility of the loan or mortgage for insurance, and the validity of any contract of insurance so executed shall be incontestable in the hands of an approved financial institution or approved mortgagee from the date of the execution of such contract, except for fraud or misrepresentation on the part of such approved financial institution or approved mortgagee.

NHA § 203(e), 12 U.S.C. § 1709(e). Thus, pursuant to the incontestability clause, HUD must honor the contract of insurance with Midland unless there has been fraud or misrepresentation by Midland. As the underlying core of HUD's mortgage insurance program, HUD simply cannot disregard its contract of insurance with Midland or the applicable statutory provisions of the NHA. See United States v. Ron Pair Enterps., Inc., 489 U.S. 235, 241 (1989) ("[W]here, as here, the statute's language is plain, the sole function of the courts is to enforce it according to its terms") (internal quotes and citations omitted).

As the Supreme Court emphasized:

> By virtue of the power to borrow money "on the credit of the United States," the Congress is authorized to pledge that credit as an assurance of payment as stipulated, as the highest assurance the government can give, its plighted faith. To assume that

> Congress may withdraw or ignore that pledge is to assume that the Constitution contemplates a vain promise; a pledge having no other sanction than the pleasure and convenience of the pledgor. This Court has given no sanction to such conception of the obligations of our government.

Perry v. United States, 294 U.S. 330, 351 (1935); see also Bowen v. Public Agencies Opposed to Social Security Entrapment, 477 U.S. 41, 52 (1986) ("the Federal Government, as a sovereign, has the power to enter contracts that confer vested rights, and the concomitant duty to honor those rights"); Sinking-Fund Cases, 99 U.S. 700, 719 (1879) ("The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or a municipality or a citizen.")

As one court noted when a mortgagor sought to thwart HUD's right to foreclose:

> It is essential to the confidence of public and private lenders that the clear written terms of mortgages be implemented and enforced by the courts. Without such enforcement, extrinsic judicial doctrines that frustrate the terms of the mortgage documents . . . will impair the confidence of public and private lenders. . . . Further, by preserving confidence in mortgage security obligations, the courts will encourage future lending.

United States v. Victory Highway Vill., Inc., 662 F.2d 488, 495 (8th Cir. 1981). This applies equally to HUD's rights and obligations as insurer of the mortgage loans held by Midland. Accordingly, Midland and HUD should not be precluded from fulfilling their statutory and contractual obligations.

### C. Even Assuming the Stay Applies to Enjoin the Assignment of the Mortgages and Notes, this Court Should Grant HUD Relief From the Stay Due to Lack of Adequate Protection.

Title 11, United States Code, Section 362(d) makes clear that the lack of adequate protection provides justification for relief from the automatic stay. In In re Smithfield Estate, Inc., 48 B.R. 910, 915 (Bankr. R.I. 1985), HUD requested relief from the stay to foreclose on

the mortgage which was assigned to it by the lender. Although the court denied HUD's motion to foreclose on the mortgage, the court recognized the need to provide HUD adequate protection. The court recognized that, "the failure to receive regular payments will shortly erode the mortgagee's delicate secured position . . . . At this stage, where the equity cushion is marginal, at best, regular payments are essential to maintain the status quo." Id. The court then provided protection to HUD by ordering the debtor to make regular mortgage payments to HUD under the terms of the mortgage and ordered the debtor to cure the post-petition default. Id.

Similar to Smithfield, Mt. St. Francis is in default of its mortgage obligations. In addition, according to the Receiver, Midland is undersecured. (Ex. 22, March 26, 2008, Tr. 22:11-20.) In this case, HUD is not seeking to foreclose on the mortgages, but rather exercise its contractual duty to accept the assignments of the mortgages and notes from Midland and thus, stand in Midland's shoes as the mortgagee. Further, allowing the assignment to occur now rather than later, would protect HUD from incurring additional financial loss resulting from having to pay Midland accumulated interest arrearages, which amounts continue to accrue as a result of the on-going default. See 24 C.F.R.§ 232.885(b). Accordingly, to the extent that the Court rules that the stay applies to the assignment of the mortgages and notes,[11] HUD respectfully requests that the Court grant it relief from the stay by allowing the assignment of the mortgages and notes. See View Crest Garden Apartments, Inc. v. United States, 281 F.2d 844, 848 (9th Cir. 1960) ("federal policy requires affording every reasonable protection to the

[11] Seeking to respectfully comply with the Court's instructions until HUD had adequate time to brief the issue and adhering to the Court's admonition that sanctions would result if Midland and/or HUD did not stop the assignment process (See also Exs. 24-26), HUD and Midland then entered into a Joint Stipulation in which Midland withdrew its elections to assign and HUD withdrew its acceptance of the elections to assign.

security of federal investment"); Clinton Co. v. United States, No. 88 C 2705, 1991 WL 95284, at *13 (N.D. Ill. May 24, 1991) ("Strict enforcement of the terms of mortgages and recognition of HUD's right to foreclose on default also promotes the NHA's prime purpose of facilitating home building by the use of federal credit.") (attached as Ex. 23).

## III. Conclusion

For the foregoing reasons, HUD respectfully requests that the Court find that the stay in this receivership is inapplicable to the assignment of the Mt. St. Francis mortgage loans to HUD or, in the alternative, prays for relief from the stay to allow Midland and HUD to comply with the NHA, its regulations, and Midland's contract of insurance with HUD, which requires Midland to elect to assign the mortgages to HUD and HUD to proceed with the acceptance and processing of the mortgage assignments.

Respectfully submitted,

ROBERT CLARK CORRENTE
United States Attorney

/s/ Ly T. Nguyen
LY T. NGUYEN
Assistant United States Attorney
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
401-709-5000
401-709-5017 (fax)
Email: ly.nguyen@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of July, 2008, I caused to be electronically filed the within motion, supporting memorandum, and exhibits with the Clerk of the United States District Court for the District of Rhode Island, using the CM/ECF system. The following participant(s), as identified on the Notice of Electronic Filing, has received notice electronically:

| | |
|---|---|
| Joseph Avanzato | javanzato@apslaw.com, vlanctot@apslaw.com |
| James E. Brown | James.E.Brown2@usjoj.gov, northern.taxcivil@usdoj.gov |
| Dulce Donovan | dulce.donovan@usdoj.gov, gale.james@usdoj.gov, Kellyann.anderson@usdoj.gov, nancy.a.diquinzio@usdoj.gov, Paulette.gamache@usdoj.gov , usari-ecf@usdoj.gov |
| R. Thomas Dunn | tdunn@lmkbw.com |
| Joseph P. Ferrucci | jferrucci@frlawri.com, cmulhearn@frlawri.com, gabodelly@frlawri.com, jsmith@frlawri.com |
| Douglas A. Giron | dgiron@shslawfirm.com, asalvaggio@shslawfirm.com, dsmith@shslawfirm.com, phalperin@shslawfirm.com, |
| Christopher H. Little | clittle@lmkbw.com, mbranco@lmkbw.com, spomeroy@lmkbw.com |
| Geoffrey W. Millsom | gmillsom@apslaw.com, stheriault@apslaw.com |
| Christopher M. Mulhearn | cmulhearn@frlawri.com, lverria@frlawri.com |
| Stephen Prignano | sprignano@eapdlaw.com, eallard@eapdlaw.com, rjil@eapdlaw.com |
| Allan M. Shine | ashine@wszlaw.com, efile@wszlaw.com, egarant@wszlaw.com |
| Mark W. Freel | Mfreel@eapdlaw.com |

A copy has been forwarded by regular mail to:

Edward L. Maggiacomo
Adler Pollock & Sheehan, P.C.
One Citizens Plaza
8th Floor
Providence, RI 02903

Charles A. Lovell, Esq.
Partridge Snow & Hahn LLP
180 South Main Street
Providence, RI 02903

Genevieve M. Martin, Esq.
Assistant Attorney General
150 South Main Street
Providence, RI 02903

Jonathan Savage, Esq.
Schechtman Halperin Savage
1080 Main Street
Pawtucket, RI 02860

Terry Biafore, Sr.
Babcock & Hellwell, Inc.
138 Main Street
Wakefield, RI 02879

Deborah B. Buffi, Esq.
Deputy Chief Legal Counsel
R.I. Department of Human Services
600 New London Ave., BDG 57
Cranston, RI 02920

Marc D. Wallick, Esq.
Wallick & Associates Ltd.
51 Jefferson Boulevard
Warwick, RI 02888

Janet E. Joly
Accounting Manager Client Rep
MMJUA of RI
10 Weybosset Street, Suite 502
Providence, RI 02903

Maureen Hobson, Esq.
R.I. Department of Health
3 Capital Hill, Room 404
Providence, RI 02908

Division of Taxation
State of Rhode Island
1 Capital Hill, Suite 7
Providence, RI 02909

Lisa Daniels-Burgo, Esq.
HUD
121 South Main Street, Suite 300
Providence, RI 02903

/s/ Ly T. Nguyen
LY T. NGUYEN
Assistant United States Attorney
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
(401) 709-5000/(401) 709-5017 (fax)
Email: ly.nguyen@usdoj.gov