```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF RHODE ISLAND
_____
                                       )
ANTONIO L. GIORDANO                    )
        Plaintiff,                     )
                                       )
    vs.                                )   C.A. No. 08-48 S
                                       )
MT. ST. FRANCIS ASSOCIATES, L.P.,      )
                Defendant.             )
_____)
                                       )
UNITED STATES OF AMERICA,              )
        Interpleader-Plaintiff,        )
                                       )
    vs.                                )
                                       )
ANTONIO L. GIORDANO, MT. ST.           )
FRANCIS ASSOCIATES, L.P., and          )
JOSEPH FERRUCCI, ESQUIRE, as           )
Receiver,                              )
                                       )
        Intervenor-Defendants.         )
_____)
```

**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

The subject of these receivership proceedings is Mount Saint Francis Associates, a 194-bed nursing home in Woonsocket, Rhode Island ("MSF," the "facility," or the "nursing home"). The United States Department of Housing and Urban Development ("HUD") holds mortgages on MSF, and wants to sell the mortgages and their associated promissory notes to the highest bidder at a note sale. The note sale is a type of auction at which bidders may offer to buy the outstanding notes of approximately $9.3 million for a smaller sum. The Substitute Permanent Receiver W.

Mark Russo, Esq.[1] (the "Receiver"), petitions the Court for a preliminary injunction against the note sale pending efforts to complete a sale of the facility. While the Court strongly disapproves of HUD's conduct in this action, the Court has concluded that, unfortunately, it lacks the authority to direct HUD not to hold the note sale. The Receiver's motion for an injunction must therefore be denied.

I.  Background

These proceedings boast a tortured history. While there is no need to recite all of it here, some context is helpful to understand why the Receiver and this Court believe HUD is acting against its own interests, as well as the interests of the taxpayers and this Receivership.

At the center of this case stands a nursing home currently housing approximately 120 patients, significantly less than its full capacity. The patient count has fluctuated over the past two years as public confidence in the survival of MSF has waxed and waned, given the uncertainty surrounding the outcome of these proceedings. Because Rhode Island faces the same shortage of elder care services plaguing states nationwide, it is obvious that MSF serves a critical need in the community. MSF also employs dozens of nurses and other caregivers, and so remains a

---

[1] The original Receiver, Joseph Ferrucci, Esq., sadly passed away in November 2009. The Court appointed Mark Russo, Esq., Mr. Ferrucci's partner, as Substitute Permanent Receiver.

source of livelihood for a hard-hit community in a state with one of the highest unemployment rates in the nation.

Following the removal of this matter to this Court, HUD appeared in the case because it had insured the original mortgages. (Memorandum in Support of Limited Objection of the Secretary of Housing and Urban Development to Receiver's Petition to Sell Real Estate and Business Assets Free and Clear of Liens 6, ECF No. 38, Jun. 20, 2008 (hereinafter "HUD Initial Obj.").) According to a regulatory agreement recorded with the original mortgage, HUD reserved the right to approve any change of ownership of the nursing home. In addition, while this case was pending, HUD assumed the role of the lender when Midland Loan Services, Inc. ("Midland") assigned the mortgages and their associated notes to HUD. (See Consent Order ¶ 1, ECF No. 51, July 31, 2008 (hereinafter "Consent Order").)

In the spring of 2008, American Senior Living Corporation ("ASLC"), which has been managing and operating MSF for the duration of these proceedings, offered to buy the nursing home for the approximate amount of the mortgage debt, $9.3 million. (See Real Estate Purchase and Sale Agreement at 4 (hereinafter "Offer"), Ex. B to Receiver's Petition to Sell Real Estate & Business Assets Free and Clear of Liens, ECF No. 32, June 9, 2008 (hereinafter ("First Sale Pet.").). Pursuant to a Purchase and Sale Agreement that memorialized the offer, ASLC also agreed

3

to pay $900,000 into the Receivership to create a fund for adjudicating claims against the estate in their order of priority. (See id. at 4.) The original Receiver petitioned for authority to sell the facility to ASLC free and clear of government liens. HUD filed a limited objection asserting its right to sign off on the transaction. However, in its objection, it also stated:

> HUD is not per se opposed to the sale of the nursing home. Indeed, HUD recognizes the acquisition of the nursing home by a responsible buyer subject to or including the assumption of the existing mortgages, as well as the continuing operation of the nursing home as a viable business, benefits HUD's interests and the public interest.

(HUD Initial Obj. at 4-5.)

On July 31, 2008, the Court entered an Order authorizing ASLC's purchase of MSF (the "Sale Order"), following the satisfaction of three key preconditions. (See Order, ECF No. 49, July 31, 2008 (hereinafter "Sale Order").) First, the Receiver was required to solicit other bids for MSF pursuant to 28 U.S.C. § 2001, and to accept any higher and better offer in lieu of ASLC's bid. (Sale Order ¶ 7.) Second, HUD would have to approve any final sale. (Offer at 3.) Third, ASLC had no obligation to buy unless HUD refinanced the mortgages. HUD would have to provide refinancing under a specific HUD program called "section 223(a)(7)," or "some other refinancing option

4

that may be proposed by HUD that is acceptable to [ASLC] in its reasonable discretion." (Id.)

The Purchase and Sale Agreement contemplated that the deal would close by September 30, 2008. However, if the closing did not occur by that date, the Agreement could be extended through December 31, 2008. (See id. at 5.)

The same day it issued the Sale Order, the Court entered a Consent Order signed by all parties, including HUD. Under the Consent Order, HUD stood to recover all accrued and delinquent principal on the mortgages from ASLC, as well as interest in the form of a "balloon payment" at the end of the mortgage amortization schedule. (See Consent Order ¶¶ 2, 4, ECF No. 51, July 31, 2008.) The Consent Order also set restrictions on the timing of any note sale:

> 5. HUD agrees that it will not put the notes into a note sale until after the Closing Date of September 30, 2008, or up to December 31, 2008 (in the event that the existing Purchase and Sale Agreement is extended pursuant to . . . the Purchase and Sale Agreement).
> 6. If the existing Purchase and Sale Agreement between ASLC and the Receiver is terminated for any reason, or the closing does not occur by December 31, 2008, . . . the agreement to not include these notes in a note sale . . . shall terminate. At such time, HUD agrees to consider the terms of any new purchase and sale agreement and make a timely decision as to whether it remains in HUD's best interest to modify the payment of delinquent interest or to hold these notes.

(Id. ¶¶ 5-6.)

No higher and better offers materialized within the time frame for the bid process established by the Sale Order. Thus, HUD and ASLC began negotiations over refinancing the MSF mortgages. The challenge was to agree on terms that would maximize the amount of debt ASLC could repay based on the income MSF was expected to generate.

While there is no formal record of the next year and a half of negotiations, many of them took place in conferences with this Court, so the Court is in a position to summarize them. The first proposed option for financing fell through because HUD and ASLC could not agree on terms. ASLC hoped to reach a different solution, but as time dragged on, HUD became concerned about the accumulation of unpaid interest on the mortgages. Thus, in December 2008, when it became clear that closing was, at least, many months away, HUD announced its intent to include the MSF mortgages and associated promissory notes in a note sale coming up in February 2009. (See Letter to Court from Ly T. Chin, Esq., Dec. 24, 2008, ECF No. 68.)

The original Receiver opposed the note sale, believing it would inject uncertainty into the parties' efforts to reach a closing as a new note holder entered the picture. In particular, the Receiver worried that any disposition of the notes would amplify public fears about the fate of the facility, which could cut into MSF's revenues by causing the patient count

to drop.  That could make it impracticable for ASLC to persist with its $9.3 million bid.  The Receiver also urged HUD not to risk a heavy discount on the mortgage debt at a note sale, and instead to hold out for a greater return on the mortgages that ASLC might be able to provide by improving MSF's value as a going concern.

Under pressure from the Receiver and the Court, HUD relented.  It agreed to hold off on the note sale and attempt to hammer out a refinancing plan.  One stumbling block was that a recent appraisal of the property, conducted pursuant to regulations governing one of the proposed HUD financing programs, came in several million dollars below the amount of outstanding debt.  To fix that problem, HUD indicated that it might be willing to write down the debt.  The attorneys who have appeared in this matter on HUD's behalf spent several months seeking internal approval for the write-down, but in the fall of 2009 they informed the Court that the plan had been rejected, and that HUD again intended to conduct a note sale.  Yet, once again, HUD backed off: according to the Receiver, HUD informed him that a note sale was too risky.  The reasons are not difficult to fathom: the note would likely fetch only a fraction of its face value, given the declining value of the property and the increasing claims against the estate.  HUD and ASLC then resumed their attempts to reach a negotiated settlement that

7

resolved the financing problems and allowed for the sale of MSF to ASLC.

In early 2010, the parties took up a new proposal to restructure the debt so that ASLC could service it with income from MSF. Based on that approach, ASLC and HUD reached agreement in principle on a process for completing the refinancing and closing the sale of the facility. The Court therefore entered an order allowing forty-five days for HUD to "complete its review of the mortgage modification proposal." (Order ¶ 1, ECF No. 78, May 14, 2010.) Informally, HUD represented to the Court that the approval process involved a review by the office of the Commissioner of HUD, and that once the Commissioner signed off, the deal could proceed to the next stage. HUD also indicated, again informally, that it did not foresee any major obstacles to the sign-off. It seemed that, at long last, the sale of MSF would take place; the new owner would stabilize the situation; creditors would begin to be repaid from the set-aside proceeds of the sale; and the taxpayers would see their loan (through HUD) begin to be repaid at a level that at least approached the full outstanding amount of debt.

However, just before the forty-five day approval period ended, HUD informed the receiver that a newly-formed branch of HUD with the ironic (or perhaps oxymoronic) name of "Office of Risk Management" had appeared on the scene and expressed

objections to the proposal.[2]  Despite the Receiver's efforts to educate the new officials about the long history of the case, and ASLC's willingness to revise the terms of the loan documents under consideration, in July of this year Risk Management rejected the plan to restructure the debt.  HUD then indicated, yet again, that it would conduct a note sale.

Throughout the negotiations discussed above, administrative expenses have accumulated.  The Receiver has continued to incur the costs of his services in attempting to finalize a sale of the facility and ASLC has continued to incur costs in maintaining MSF.  The economy, and in particular the real estate market, have collapsed as the country and Rhode Island entered the great recession of 2010.  Moreover, without a structured deal as contemplated by the Consent Order and the Sale Order, there is now no provision for a sum certain to be set aside to partially satisfy the various claims that have been accumulating against the estate.

In the wake of the collapse of discussions between ASLC and HUD, the Receiver has moved for approval of a Supplemental Sale Order, dependent on a second solicitation of bids for MSF.  The Receiver further asks the Court to enforce HUD's compliance with

---

[2] The only sense in which this cracker-jack unit of HUD is managing risk in this case is that it is managing to increase the risk of loss to taxpayers on the outstanding mortgage obligation.

paragraph 6 of the Consent Order by issuing a preliminary injunction that prevents HUD from conducting the note sale for 60 days.

HUD responds that the Court has no jurisdiction to enjoin it from doing anything, because it has not waived sovereign immunity. Therefore, it says, it acts with impunity and has no obligation to comply with this Court's orders, regardless of the Court's equitable powers in a receivership. HUD further contends that the Receiver has not satisfied the standard for issuing a preliminary injunction.

## II. HUD's Sovereign Immunity

HUD's invocation of sovereign immunity raises a threshold barrier to the Court's consideration of the merits of the Receiver's motion. Unless Congress has waived the agency's immunity in these circumstances, the Court cannot enjoin the note sale, because it cannot "restrain [HUD] from acting, or . . . compel it to act." Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 704 (1949); see United States v. Murdock Mach. & Eng'g Co. of Ut., 81 F.3d 922, 931 (10th Cir. 1996) ("Indeed, the United States' immunity from 'suit' extends . . . to all types of injunctive process and relief."); Natural Res. Def. Council, Inc. v. E.P.A., 484 F.2d 1331, 1335 (1st Cir. 1973) (explaining that "[o]nly Congress" can provide consent for an agency to be subject to any type of judicial relief). The

fact that HUD has appeared in these proceedings does not amount to a waiver, because "[i]t is settled that a waiver of sovereign immunity cannot be implied but must be unequivocally expressed" by the legislature. Santa Clara Pueblo v. Martínez, 436 U.S. 49, 58 (1978).

HUD contends that it has absolute authority to proceed with the note sale pursuant to 12 U.S.C. § 1715z-11a(a). That statute provides, in relevant part:

> **(a) Flexible authority for multifamily projects**
> [T]he Secretary [of HUD] may manage and dispose of multifamily properties owned by the secretary . . . and multifamily mortgages held by the Secretary on such terms and conditions as the Secretary may determine, notwithstanding any other provision of law.

12 U.S.C. § 1715z-11a(a) (2010). According to HUD regulations, the term "multifamily project" includes nursing homes. See 24 C.F.R. § 290.3. One court has held that § 1715z-11a(a) does control note sales involving nursing home mortgages, and further that HUD's actions pursuant to that statute are protected by sovereign immunity. See Jewish Center for Aged v. U.S. Dep't of Hous. & Urban Dev., No. 4:07-CV-750 (JCH), 2007 WL 2121691, at *5 (E.D. Mo. July 24, 2007) (holding that Congress had "not waive[d] HUD's sovereign immunity" for acts taken under § 1715z-11a(a)).

In Jewish Center for Aged, a nursing home sought to enjoin HUD from disposing of a mortgage it held on the plaintiff's

11

property at a note sale.  The court first found that § 1715z-11a(a) governed the note sale, because it granted HUD authority to "manage and dispose" of mortgages it held "notwithstanding any other provision of law." See id. The court next considered whether § 1715z-11a(a) fell within the waiver of sovereign immunity for HUD activities under the National Housing Act ("NHA") in 12 U.S.C. § 1702.  The court decided the answer was no, because § 1715z-11a(a) was not part of any provision specifically enumerated in the waiver, which only referenced sections of the original NHA.  See Act of Aug. 23, 1935, c. 614 § 344(a), 49 Stat. 722 (as amended) (authorizing the Secretary of HUD "to sue and be sued in any court of competent jurisdiction, State or Federal," when carrying out specific provisions of the NHA); see also Jewish Center For Aged, 2007 WL 2121691 at *4 (explaining that the version of the waiver in the original enactment and published in the Statutes at Large applied only to the NHA, and prevailed over conflicting language in 12 U.S.C. § 1702).  The court therefore concluded that HUD was immune from plaintiff's lawsuit. See id. at *6.

This Court has found no authority that might undercut the analysis in Jewish Center for Aged, and Judge Hamilton's opinion is persuasive.  Indeed, other courts have found that HUD maintains its sovereign immunity when acting pursuant to statutes other than those listed in the NHA waiver.  See United

12

Am., Inc. v. N.B.C.-U.S.A. Hous., Inc. Twenty Seven, 400 F. Supp. 2d 59, 62 (D.D.C. 2005) ("To contend that a provision not expressly enumerated is still covered by [the waiver] would render the enumeration superfluous."); Almeida v. U.S. Dep't of Hous. & Urban Dev., No. 08 Civ. 4582 (SCR), 2009 WL 873125, at *3 (S.D.N.Y. Feb. 11, 2009) (holding that sovereign immunity sheltered HUD actions under 12 U.S.C. § 1701z-11); see generally Armor Elevator Co. v. Phoenix Urban Corp., 655 F.2d 19, 21-22 (1st Cir. 1981) (discussing the scope of the NHA waiver and concluding that claims that would not require HUD to carry out the NHA if successful did not qualify for the waiver).

Accordingly, the Court must conclude that HUD is sheltered by sovereign immunity in conducting the note sale. Therefore, the Court is powerless to protect the taxpayers, the claimants, and the residents and employees of MSF from the bureaucrats in Washington, D.C. who want to sell the note before the Receiver can sell the facility, despite the harm this will cause the Receivership and the public interest.

During these proceedings, HUD itself has tacitly recognized that a negotiated refinancing deal with ASLC could yield a higher return on the notes than an auction. "Indeed," HUD declared in 2008, finding a buyer to assume the existing mortgages "benefits HUD's interest and the public interest." (HUD Initial Obj. at 4-5.) The Consent Order included

commitments from ASLC to "make the mortgages current with respect to all accrued and delinquent principal," and to pay delinquent interest on the loans at the end of the repayment period. (Consent Order ¶ 2, 4.) HUD now complains about deferred interest on the mortgages as receivership drags on, but of course these delays are, in large part, HUD's own fault. This is the third time HUD has come to the brink of a refinancing agreement, only to retreat after months of negotiations. All the while, administrative expenses have continued to pile up, while the economy and property values have gone down.

The Court is at a loss to explain the behavior of government officials over the course of the last several years, particularly this latest maneuver.[3] There was a point early in this Receivership when a structured deal would likely have resulted in the taxpayers receiving close to full recovery of the amounts owed to the IRS and HUD. Now taxpayers are likely to get a small fraction of what they are owed, if that. But

---

[3] The Court can only speculate that HUD's Risk Management office is hopeful to recover some funds to boost HUD's capital reserve ratio and thereby improve its standing with Congress. (See generally Tr. 38:15–40:14, Aug. 30, 2010.) Or, perhaps officials in this administration want to take the loss and blame their predecessors rather than risk a loss in the future that might be blamed on them. Of course, neither of these goals helps the stakeholders of MSF or the taxpayers.

throughout the process government officials have obstructed, delayed, and misled the parties and the Court.

It is truly unfortunate that this Court cannot stop HUD and its "Office of Risk Management" from taking this step. If this Court had the jurisdiction to enjoin the note sale, it would do so without question. The decision would not be a close call.

All of this leads the Court to suggest to Congress that perhaps too much unilateral authority has been vested in HUD with respect to the disposal of notes pursuant to § 1715z-11a(a). In light of this situation (and perhaps there are other examples) it may well be appropriate for Congress to consider amending § 1715z-11a(a) to waive sovereign immunity explicitly for this statute, so that federal courts in the future can prevent the kind of harm HUD intends to inflict on the people of Rhode Island. To facilitate this suggestion, the Court directs that this Opinion and Order shall be transmitted by the Receiver to each member of the Rhode Island Congressional delegation with an explanatory letter. Furthermore, the Court directs the Receiver to meet with the staff of each member (and the member if possible) to fully brief them on HUD's conduct in this proceeding.

III. Conclusion

For the reasons set forth above, the Receiver's motion to enforce compliance with the consent order is DENIED. The Court

15

defers ruling at this time on the Receiver's motion to approve a supplemental sale order, which was filed as part of the same motion as the motion to enforce compliance, because the parties anticipated submitting a consented-to order to allow for the sale.  The motion for approval of the sale order thus remains pending.

IT IS SO ORDERED.

*/s/ William E. Smith*
William E. Smith
United States District Judge
Date:  September 10, 2010